[Cite as *State v. Miller*, 2015-Ohio-330.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-130774 |
| | | TRIAL NO. B-1202926 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| | | |
| SIR MICHAEL MILLER, | : | |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, Sentences
                                    Vacated and Cause Remanded

Date of Judgment Entry on Appeal: January 30, 2015

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp*,
Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*The Farrish Law Firm* and *Michaela M. Stagnaro,* for Defendant-Appellant.

Please note:  this case has been removed from the accelerated calendar.

**DEWINE, Judge.**

{¶1}    Sir Michael Miller was found guilty and sentenced to prison for his role in a shooting incident that left three people wounded.   In this appeal, Mr. Miller contends that the court allowed in inadmissible evidence, that his counsel was ineffective for not objecting to the evidence, that his convictions were not supported by sufficient evidence and were against the weight of the evidence, and that the trial court erred when it imposed consecutive sentences.  We conclude that the court erred when it imposed consecutive sentences without stating its findings at the sentencing hearing and without incorporating its findings into its sentencing entry.   In all other respects, we affirm the judgment of the trial court.

## I.   Background

{¶2}    On an April night in 2012, a group of individuals was gathered outside the Virginia Apartments in Avondale.  A car pulled up, and at least one masked man got out and opened fire.    Three members of the assembled group were hit by gunfire—Deion Jennings was shot once, Cameron Watkins three times, and Tyisha Pates five times.

{¶3}    Monica Henderson happened to be looking out her apartment window shortly before the shooting.   Ms. Henderson saw a "burnt-orange" colored car that resembled a PT Cruiser pull up around the bend from where Mr. Jennings's group was gathered.  Although it was nighttime, the car's headlights were not illuminated.  She told the court that she saw a male passenger jump out of the back seat of the car and walk around to the side of the apartment building.   Ms. Henderson then heard lots of gunshots.   The passenger jumped back into the car, and the car sped away.   Ms. Henderson called 911.

{¶4} Shortly after receiving reports of the shooting, police officers stopped an orange HHR vehicle. The car's headlights were not on. During the trial, Ms. Henderson acknowledged that the HHR vehicle, which looks similar to a PT Cruiser, was the car she saw before the shooting. Sir Michael Miller[1] was driving the car. Before the car was stopped, another man jumped out and ran away. A police officer with a canine partner was called to the scene to track the man who had fled. The canine team was unable to find the man who had run, but it did discover a firearm close to the path the man had taken. Bullet casings found at the scene of the shooting matched the gun that was found. Some gunshot residue was found on Mr. Miller's hands, and a white tee shirt that was in the car had Mr. Miller's DNA on it. Six cell phones were found in the car. One of the cell phones was registered to Carlos Davis, leading the police officers to theorize that Mr. Davis was the individual who had run from the car. Mr. Miller was taken into custody and transported to police headquarters.

{¶5} During the trial, Officer David Gregory testified about an ongoing dispute between two groups in the area—a group that hung out at Ponciana Apartments and a rival group that congregated at 914 Burton Street. One of the victims, Mr. Jennings, was associated with the Ponciana group. Mr. Miller, Mr. Davis and Rodney "Nut" Watkins were part of the 914 Burton group. Mr. Jennings agreed that there had been tension between the two groups. That tension escalated days before the shooting at the Virginia Apartments, when Nut Watkins was killed. Mr. Miller was there when Nut was shot and drove him to the hospital. Text messages between Mr. Miller and his friends indicated that Mr. Miller was very upset about Nut's death and a drive-by shooting that occurred at Nut's memorial service.

---

[1] We identify Mr. Miller as "Sir," not as a form of honorific address, but rather because Sir is apparently his first name.

3

{¶6} At the conclusion of the bench trial, the court found Mr. Miller guilty of complicity to the felonious assaults of the three victims and of having a weapon while under a disability. The court sentenced him to five years for each felonious assault, with an additional three years for the gun specification, and to three years for having a weapon while under a disability. The sentences were made consecutive, for an aggregate term of 21 years.

## II. The State's Leading Questions

{¶7} In his first assignment of error, Mr. Miller asserts that the trial court erred when it allowed the state to improperly refresh the recollections of Mr. Jennings and Ms. Pates. Specifically, he contends that the court erred by allowing the state to show the witnesses statements that they had made to the police, then asking them leading questions based on these statements.

{¶8} As an initial matter, we note that while Mr. Miller couches this assignment of error under Evid.R. 612, the rule on using a writing to refresh memory, his evidentiary objection is better understood under other parts of the evidentiary rules. As Mr. Miller concedes in his brief, "asking the witnesses to read the notes was not, in and of itself, erroneous." What Mr. Miller really seems to be arguing is that the court allowed the state to impermissibly ask leading questions under Evid.R. 611(C), and that the state should not have been allowed to put the prior (hearsay) statements of the witnesses before the trier of fact by repeating those statements in its examination.

{¶9} In the first instance, the state questioned Mr. Jennings about whether he had identified the clothes worn by Mr. Miller as the clothes that one of the shooters had worn. A day after he was shot, police officers showed Mr. Jennings a photograph that had been taken of Mr. Miller at police headquarters. At trial, Mr. Jennings stated that he could not remember making a statement to police officers about the clothes that Mr.

4

Miller wore in the photograph. After asking Mr. Jennings to review his statement to police officers, the state asked, "[Y]ou can't remember saying, 'Those are the clothes'?" Mr. Jennings responded, "I can't. I really can't." Again the state asked, "And you see the last statement there? 'I've seen the clothes, that shirt before on the shooter.' Remember saying that?" Mr. Jennings again said, "No."

{¶10} The state later used a leading question during its direct examination of Mr. Jennings when it asked, "[I]n your discussion with the police on the 4th you told them that you—as a matter of fact, it says you agreed you were the target, that it was a Ponciana versus Burton. Remember telling the police that?" Mr. Jennings answered, "Yes. I said it was tension."

{¶11} The state also used leading questions when questioning Ms. Pates, asking "Isn't it the case that you heard one of the shooters say 'Deion' before the shooting started?" Ms. Pates responded, "Uh-huh."

{¶12} Because Mr. Miller did not object at trial, our review is limited to plain error. *See* Crim.R. 52(B). We conclude that Mr. Miller has not demonstrated "that the outcome of the trial would clearly have been different but for the trial court's allegedly improper actions." *See State v. Waddell*, 75 Ohio St.3d 163, 166, 661 N.E.2d 1043 (1996). Mr. Miller was convicted of complicity to felonious assault; the state did not try to prove he was a shooter himself. Whether he had on the clothes worn by the shooter was of little consequence in light of other evidence that he was the driver of the car that brought the shooter or shooters to and from the scene. And the tension between the two groups and the suggestion that the shootings were targeted at members of the Ponciana group was strongly established by other evidence during the trial. The first assignment of error is overruled.

### III. Admission of Text Messages

{¶13}     Mr. Miller's second assignment of error is that the trial court erred when it admitted evidence about text messages sent to and from Mr. Miller and text messages sent to and from his suspected accomplice, Mr. Davis.   Mr. Miller contends that admission of the records of the text messages was improper because the content of the text messages to and from Mr. Miller was inadmissible hearsay, because there was no way to know if Mr. Miller was the person who had sent and received those messages, and because the messages to and from Mr. Davis were hearsay, irrelevant and unduly prejudicial.  Mr. Miller did not object to the admission of the text records during trial, so we review for plain error.  *See* Crim.R. 52(B).

{¶14}     The state introduced records of cell phone accounts connected to Messrs. Miller and Davis.    Paula Papke, a security manager with Cincinnati Bell, testified that the records were kept in the course of ordinary business.  Ms. Papke also explained that each cell phone had a distinct number belonging to that phone (an "IMEI number") and that SIM cards, which had their own distinct identifying numbers (an "ICC ID number"), could be transferred from one device to the other.   Using IMEI numbers and ICC ID numbers in the Cincinnati Bell records, Ms. Papke was able to connect the cell phone accounts for three of the six phones found in the HHR vehicle to Mr. Miller and Mr. Davis.

{¶15}     Officer Gregory testified about text messages between Mr. Miller and three friends.  In the texts, Mr. Miller stated that he was "salty"—or very upset—because "Lil Nut" got killed.  He also was upset because someone fired upon the memorial service for Nut.   The state suggested that the texts established a motive for the April 1 shootings.   He also testified about texts sent to the cell phone registered to Mr. Davis. The messages, which were sent after the April 1 shootings, reported that Mr. Miller had

been taken into custody and asked where Mr. Davis was and if he was okay. Officer Gregory surmised that these texts pointed to Mr. Davis as the person who had fled from the car.

{¶16} We conclude that Mr. Miller has not demonstrated plain error with respect to the text messages. The records of the cell phone accounts were admissible as business records. *See* Evid.R. 803(6); *State v. Blake*, 12th Dist. Butler No. CA2011-07-130, 2014-Ohio-3124. And, Ms. Papke's testimony connecting the cell phone records to Mr. Miller was sufficient to create an inference that Mr. Miller had sent the messages about which Officer Gregory testified.

{¶17} As to the messages themselves, most were properly admitted as non-hearsay or under an exception to the hearsay rule. The text messages from Mr. Miller were admissible as nonhearsay "Admission[s] by party-opponent." *See* Evid.R. 801(D)(2). Likewise, most of the messages sent to Mr. Miller and Mr. Davis were not hearsay because they were not offered for the truth of the matter asserted. *See* Evid.R. 801(C). The messages to Mr. Miller that the sender was "so sad and sorry" about Nut and urging him to "be safe out there" put in context Mr. Miller's statements about being angry. Arguably, at least, a few messages came into evidence that did not fit within a hearsay exception. But none of these messages were particularly prejudicial to Mr. Miller. We cannot say "that the outcome of the trial would clearly have been different but for the trial court's allegedly improper action," and thus find no plain error. *See Waddell*, 75 Ohio St.3d at 166, 661 N.E.2d 1043. The second assignment of error is overruled.

## IV. Ineffective Assistance of Counsel

{¶18} In his third assignment of error, Mr. Miller asserts that he was denied a fair trial due to the ineffective assistance of counsel. He argues that his counsel was

ineffective because he did not object to the state's use of leading questions with its own witnesses or the admission of the contents of the text messages. This contention is not well founded. Mr. Miller has not demonstrated that had his attorney objected to the state's cross-examination and admission of the text messages, the result of the proceedings would have been different. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989). The third assignment of error is overruled.

### V. Sufficiency and Weight of the Evidence

{¶19}    Mr. Miller's fourth assignment of error is that his convictions were based on insufficient evidence and against the weight of the evidence. As to the sufficiency argument, our review of the record reveals that the state adduced substantial, credible evidence from which the jury could have reasonably concluded that the state had proved beyond a reasonable doubt the elements of complicity to felonious assault. *See State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. And in regard to the manifest-weight argument, our review of the entire record fails to persuade us that the trial court clearly lost its way and created such a manifest miscarriage of justice that we must reverse Mr. Miller's convictions and order a new trial. *See State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997). The fourth assignment of error is overruled.

### VI. Sentencing

{¶20}    Finally, in his fifth assignment of error, Mr. Miller asserts that the court erred when it imposed his sentences. He argues that the court did not make the findings required by R.C. 2929.14(C)(4) before imposing consecutive sentences and that the court abused its discretion because it did not consider the purposes and principles of sentencing before imposing sentence. He also contends that the court failed to inform

8

him, as required by R.C. 2929.19(B)(2)(f), that he should not ingest drugs of abuse in prison and that he would be subject to random drug testing while in prison. We have held, however, that "R.C. 2929.19(B)(2)(f) confers no substantive rights." *State v. Haywood,* 1st Dist. Hamilton No. C-130525, 2014-Ohio-2801. Therefore, Mr. Miller was not prejudiced by the trial court's failure to provide the notification, and the error is harmless. *Id. See State v. Cutlip,* 2d Dist. Champaign No. 2012 CA 11, 2012-Ohio-5790, ¶ 19.

{¶21} Contrary to Mr. Miller's assertion, we no longer review sentences under an abuse-of-discretion standard. Rather, we may modify or vacate Mr. Miller's sentences only if we " 'clearly and convincingly find' that either (1) the record does not support the mandatory sentencing findings, or (2) that the sentence is 'otherwise contrary to law.' " *State v. White*, 2013-Ohio-4225, 997 N.E.2d 629, ¶ 11 (1st Dist.); R.C. 2953.08(G)(2). Although the court did not place on the record its consideration of the purposes and principles of sentencing as guided by R.C. 2929.11 and 2929.12, we may presume that the court considered the proper sentencing factors absent a demonstration to the contrary. *See State v. Love*, 194 Ohio App.3d 16, 2011-Ohio-2224, 954 N.E.2d 202, ¶ 14 (1st Dist.).

{¶22} With respect to the consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry. *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, syllabus. The court "must state the required findings as part of the sentencing hearing, and by so doing it affords notice to the offender and defense counsel." *Id.* at ¶ 29. Here, the court filled out a sentencing worksheet with the requisite findings, but it did not "state" those findings at the sentencing hearing. Nor did the court incorporate the findings into its sentencing entry.

We therefore must vacate the imposition of consecutive sentences and remand so that the court may resentence Mr. Miller in accordance with *Bonnell*. The fifth assignment of error is sustained to the extent that the trial court failed to comply with *Bonnell* in sentencing Mr. Miller.

Judgment affirmed in part, reversed in part, sentences vacated and cause remanded.

**CUNNINGHAM, P.J.,** and **FISCHER, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.