[Cite as *State v. Jackson*, 2024-Ohio-2419.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                            Court of Appeals No.  L-23-1044

    Appellee                                       Trial Court No.  CR0202202488

v.

Jermaine Terrell Jackson                    **DECISION AND JUDGMENT**

    Appellant                                      Decided:  June 25, 2024

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**DUHART, J.**

**{¶ 1}** This case is before the court on appeal by appellant, Jermaine Jackson, from

the February 22, 2023 judgment of the Lucas County Court of Common Pleas.  For the

reasons that follow, we affirm the trial court's judgment.

## I.  Assignments of Error

I.      The trial court abused its discretion by denying [Jackson's] motion

        for acquittal pursuant to Crim. R. 29, particularly with respect to

felonious assault of [N.J.] and discharge of a firearm on or near prohibited premises, because the convictions herein were not supported by sufficient evidence to submit to the jury.

II. [Jackson's] convictions were not supported by the manifest weight of the evidence because the State of Ohio did not prove the identity of [Jackson] beyond a reasonable doubt.

III. The trial court abused its discretion by failing to merge all appropriate sentences on the basis of allied offenses of similar import.

IV. The trial court abused its use of consecutive sentences such that the sentence imposed here is disproportionate to the harm caused in this matter.

## II. Background

{¶ 2} In the early morning hours of August 21, 2022, N.J. and T.T. were leaving a get-together at 1684 Avondale, in Lucas County, Ohio, when T.T. was shot multiple times by a person identified as "Jermaine." N.J. ran from the scene and called 911 from the yard of a house nearby.

{¶ 3} On August 30, 2022, Jackson was indicted with two counts of felonious assault, a felony of the second degree, in violation of R.C. 2903 11(A)(2) and (D) (Counts 1 and 2); one count of attempt to commit murder, in violation of R.C. 2923.02, 2903.02(A) and 2929.02, a felony of the first degree (Count 3); one count of discharge of

2.

a firearm on or near prohibited premises, a felony of the third degree, in violation of R.C. 2923.162 (A)(3) and (C)(2)(Count 4); and one count of having weapons while under disability, a felony of the third degree, in violation of R.C. 2923.13(A)(2) and (B). Each count also contained a firearm specifications in violation of R.C. 2941.145(A), (B), (C), and (F), and Counts 1 - 3 also contained repeat violent offender ("RVO") specifications in violation of R.C. 2941.149.

### III. Trial

{¶ 4} A jury trial was held beginning January 23, 2023, and the following relevant testimony was presented.

### A. State's Case

*Lieutenant Philip Cook*

{¶ 5} Philip Cook, a lieutenant with the Toledo Police Department ("TPD"),[1] is a records custodian for 911 calls. During Lieutenant Cook's testimony, a tape of a 911 call, made by victim N.J., was played. In the call, N.J. told the 911 operator that "Jermaine," her friend's boyfriend, shot her boyfriend, and also shot at her. She further explained that after being shot at, she ran and hid behind a neighbor's house. It was from there that she called 911. She described "Jermaine" as wearing a brown shirt, with dreads, and driving a white vehicle. While still on the phone, N.J. returned to the house where the shooting took place and spoke to an officer at the scene. She believed Jermaine had left the scene by the time she returned. Her conversation with the officer is

---

[1] All police personnel discussed herein were employed by the TPD.

3.

also on the 911 tape, and in it, N.J. again states that Jermaine shot her boyfriend and "popped at [her] five times," so she "had no choice" but to run.

*Officer Amerra Bryson*

{¶ 6} Amerra Bryson responded to the scene of a person shot at 1684 Avondale at approximately 2:00 a.m. on August 21, 2022. When she arrived, she found T.T. shot and on the ground, and a woman, Torie Betts, was with him.

{¶ 7} Officer Bryson was wearing a body-camera at the scene, and the video from that camera was played for the jury. The video shows T.T. lying in the street, and a man and a woman (apparently Tori) with him. The man was wearing all red. Tori was wearing brown and stated that T.T. was shot in a "drive-by."

{¶ 8} Once T.T. was transported to the hospital, Officer Bryson's job was to "protect the evidence," which included roping off the scene and checking for shell casings. When detectives arrived, her involvement in the case was concluded.

{¶ 9} With respect to the man in red, Officer Bryson testified that she did not interview him because "[i]t was determined that he did not have any involvement" when "[t]he victim's girlfriend arrived on the scene * * * and she stated * * * who the shooter was" and that the man in red was not involved.

*Detective Tyler Miller*

{¶ 10} Detective Miller and his partner also responded to 1684 Avondale on August 21, 2022, where he spoke with N.J. "a little bit farther down from the house."

4.

N.J. advised him that she and T.T. were at Avondale for a party, and when they were out front "a man named Jermaine shot at them."

{¶ 11} Detective Miller was also wearing a body-camera, the footage of which was played for the jury, including a statement by N.J that Jermaine was the shooter and that he tried to shoot her.

*Officer Claire Billinghurst*

{¶ 12} Officer Billinghurst is a patrol officer. She spoke with N.J. at the scene and, in addition, she transported N.J. to the safety building, then to N.J.'s home so N.J. could change, and last to the hospital to see T.T. N.J. also told the officer that "Jermaine" had shot at her.

*Detective Jeffrey Jackson*

{¶ 13} When Detective Jackson arrived at the scene, T.T. had already been taken to the hospital, there was crime scene tape across the street, and the house had been cleared of all persons. He took photographs and placed numbered placards with items of evidence, which included 12 cartridge casings, and then he eventually collected the evidence. Four of the casings, numbered 1 - 4, were found in the street in front of the house. He testified that the shell casing marked by placard 4 was approximately six to eight feet from the curb.

{¶ 14} Detective Jackson explained that casings are ejected from pistols when a bullet is fired, and that "the majority of pistols eject up and to the right and slightly to the rear" if the gun is being held "properly up."

5.

*Detective Leonard Beck*

{¶ 15} Detective Beck is a detective with the video unit of the TPD. He downloaded security camera footage from a home DVR system installed at 1684 Avondale. A disk containing footage from that system was admitted into evidence as State's exhibit 33.

*T.T.*

{¶ 16} T.T. explained that he was dating N.J., and that on August 20, 2022, they attended a "color party" at N.J.'s friend, Torie's house, at 1684 Avondale. A "color party" is a party where you are assigned a particular color to wear and you are to bring a snack or something of the same color. T.T. and N.J. were assigned the color green. When they arrived at the party, the party was already over, but they stayed to hang out. The only persons at the party were Torie, Jackson, who was Torie's boyfriend, and another man whom T.T. did not know. For a short while, T.T.'s sister and her friend came to the party, but they didn't stay long.

{¶ 17} T.T. explained that the party was "kind of awkward" because Torie and Jackson were arguing. There was alcohol at the party and both N.J. and T.T. had some drinks, but T.T. stated that N.J. just had "a few shots" and did not appear drunk, and he "had a buzz, but * * * wasn't like sloppy drunk or nothing like that." At one point Torie, N.J. and T.T. started walking to a bar, but eventually turned around and walked back to the house. When they returned to the house, Torie and Jackson continued to argue. They were also arguing with N.J. As T.T. explained it:

6.

And I guess they started getting on her, [N.J.] about, I guess the situation where [N.J.'s] baby daddy must have came over there like a while back and went in their house, I guess, beat her up, took her money, and I guess they felt like by me being there, and this is her ex-husband baby daddy, they felt like that he was going to come and do something * * *.

So I don't know, they felt like they was scared because they thinking that he was going to pop up over there and I was over there with her, I don't know the situation.

{¶ 18} T.T. did state, however, that N.J.'s ex-husband wasn't there that night.

{¶ 19} N.J. got upset and went outside. Initially T.T. stayed in the house, but Torie and Jackson went into a room and T.T. "could hear like a scuffle or something going on in the room," so at that point T.T. decided to leave. He went outside to try to comfort N.J. and Jackson "came out of the house and started firing shots at [T.T.]." T.T. explained what happened:

A.    …

I went outside to go try to comfort [N.J.] to see if she was okay, whatever, she was ready to go. I went out there, she was all upset about the situation, you know. I just told her, like, let's just go there, they're fighting, you know, I ain't trying to be a part of none of this. The process of us about to leave or whatever, that's when [Jackson] came out of the house and started firing shots at me.

Q. Okay. Did you have any difficulty seeing who was firing shots at you?

A. No.

Q. What happened as you were getting shot, if you remember?

A. All I remember is the door swung open and I kind of like was trying to figure out what was going on, you know, I seen -- looked like he was mad about something. I asked him, you know, hey, what's going on, kind of tried to throw my hands up a little bit to, you know what I'm saying, to try to talk to him, and the next thing I know, he just started shooting, shot me in the stomach. I turned, you know, he was walking all over me, shooting at me, I could hear bullets bouncing off the ground on the side of my head.

His girlfriend, Torie, she came out, she was trying to like, you know what I'm saying, help me but stop him at the same time. But he kept like fighting, fighting her and trying to like break through to get to me.

Q. What's the next thing you remember seeing?

A. I think I tried to, I think I tried to get up or something because I felt like if I didn't, if I wouldn't have gone out the front yard, I probably would have been dead. I tried to get up to try to like at least get as far away from the area as possible.

When I got up to try to run, I end up collapsing in the middle of the street. He kept coming back, like he came back two or three times, walking all over me with the gun. At that time I'm, you know, I'm going through the motions that I'm hit in my foot, my leg, my stomach, just trying to, you know, plead to him, like don't kill me, you know.

Q.    Was he saying anything?

A.    I can't remember exactly what he was saying, but he was real like irate, like, you know, like mad at me for whatever reason. I didn't do anything to this man.

Q.    At some point, did [Jackson] eventually stop shooting at you?

A.    Yeah.

{¶ 20} The police and paramedics arrived and T.T. was taken to the hospital. The bullets struck him in the right calf, fracturing his tibia, the left foot, the abdomen, and he was grazed on his side. He had emergency surgery due to the wound to his abdomen.

{¶ 21} While in the hospital, T.T. was shown a photo array and identified the person that shot him.

*The Video*

{¶ 22} While T.T. was testifying, State's exhibit 33, the footage from the surveillance camera, was played and T.T. was questioned regarding the events depicted in the video. T.T. stated that he didn't have any problems seeing N.J. or Jackson while they were outside.

9.

{¶ 23} As depicted in the video, two people, identified by T.T. as himself and N.J. are standing at the base of the steps to the front porch of a house talking when a man comes out of the house and starts shooting. He shoots T.T. and N.J. takes off running down the middle of the street to the left. A woman, presumably Torie, comes out of the house and seems to be attempting to stop the man from shooting. With the exception of N.J., who ran to the left, everyone is off camera to the right for a few seconds. N.J. can still be seen running down the middle of the street during this period. The woman and man come back into view and the man appears to fire a couple more shots in the direction of T.T., who is on the ground outside of the camera view. The man and the woman are then again out of view to the right. During this period, N.J. is seen in the video still running down the middle of the street to the left. While the woman and the shooter are out of camera range to the right, T.T. gets up and starts trying to get away to the left. The man comes back into the scene, running right at the edge of the street and grass, and points a gun at T.T. It is unclear if he is firing the weapon, although it looks as if he is. While the video is grainy, it appears possible that the shooter may have briefly placed his foot in the street during this period. The shooter then runs off screen to the right, and T.T. is on the ground. The woman comes back in view and attempts to help T.T., and a white four-door vehicle is seen backing into the street and driving off-screen to the right. The woman then goes off-screen to the right, the shooter comes back into view, approaches T.T. and then goes into the house, followed by the woman. A second man, who appeared to come from behind the house, approaches T.T., who again tries to get up,

10.

but then collapses into the street. The man seems to be talking to T.T., and the video ends. T.T. admitted in his testimony that this second individual "has clothing and a hairstyle that is almost identical to the person that [T.T.] named as . . . Jackson."

*Sergeant Brian Smith*

{¶ 24} Sergeant Smith showed T.T. the photo array in the hospital. He testified that, at the time T.T. looked at the photo array, there was no indications that T.T. was not of sound mind, or that he was in such pain that it would create any issues with the photo array, although the sergeant did state that he "would assume [T.T.] was medicated." According to Sergeant Smith, T.T. "viewed the photo array quickly, made an identification, said that Number 3 was the suspect." T.T. was "100 percent certain of the ID."

*Officer Scott Bruhn*

{¶ 25} Officer Bruhn was dispatched to assist a detective who was following a white Ford Fiesta. He met up with the detective, and the vehicle, when the vehicle was parked next to 1684 Avondale. Jackson was at the house and Officer Bruhn transported him to the Safety Building to be interviewed by detectives. After Jackson was interviewed, Officer Bruhn and his partner transported him to the Lucas County Jail.

*Detective Gary Bunting*

{¶ 26} Detective Bunting was the primary investigator on the case. He began by interviewing witnesses. The detective first interviewed N.J. around 4 o'clock in the morning. He testified she did not appear drunk although after talking with her for a few

minutes he could smell alcohol on her breath. He also stated that N.J. appeared "of sound mind" when he spoke with her and did not "seem at all uncertain as to who it was that shot at her and [T.T.]."

{¶ 27} Detective Bunting was asked about the other man, dressed in red, that was seen in Officer Bryson's body camera footage. He said that the man's name was Delvin Parks. He testified that there was no evidence that he was the shooter. He was asked who he believed the shooter in the video to be after visually comparing Jackson to the suspect in the video, and he responded that he believed it to be Jackson, that he "could see the hair being the same, * * the facial features with the facial hair being the same, [and] the same build." He also noticed that Jackson had a tattoo on his arm in the same area as the suspect in the video.

{¶ 28} Detective Bunting was questioned regarding whether it was possible that N.J.'s ex-husband was the shooter, a theory suggested by Jackson's trial attorney. Detective Bunting stated that the shooter left the scene in a vehicle registered to Jackson, and agreed it didn't make sense that N.J.'s ex-husband would leave in Jackson's vehicle, which Jackson had not reported stolen, or that N.J.'s ex-husband would have fled inside Jackson's home after the shooting. Additionally, it was pointed out that at the scene, Torie Betts, Jackson's girlfriend, told the police that it had been a "drive-by." Detective Bunting testified that this was her attempt to cover-up for the shooter, and that it wouldn't make sense for her to cover up for N.J.'s ex-husband. Instead, Detective Bunting

12.

believed that she said that "to throw officers off that it was actually [Jackson] that had committed the shooting."

{¶ 29} Later on the morning of August 21, 2022, Detective Bunting went to 1684 Avondale after Jackson was seen arriving there in his vehicle. He went to the back of the house to make sure nobody ran out that way. Jackson emerged from the back door and was eventually placed in custody.

{¶ 30} On August 22nd, Detective Bunting spoke with T.T. at the hospital. He described him as talkative, lucid, and of sound mind. He did not think T.T. appeared "to be under the influence of any drugs or alcohol such that he could not communicate effectively." In talking about the events of the day before, T.T. did not seem confused or unsure about who had shot him. At one point the detective left the room so that Sergeant Smith, as a blind administrator, could show T.T. the photo array. When Sergeant Smith was done, he indicated that T.T. had chosen Jackson's photo.

{¶ 31} During his investigation, Detective Bunting determined that Jackson was prohibited from having or using a firearm due to a conviction for an offense of violence in Michigan.

{¶ 32} Upon cross-examination, defense counsel pointed out that, in the video, there was another male at the scene of the shooting that was physically similar to Jackson. Both were African-American males with dreadlocks wearing T-shirts, shorts and tennis shoes. During the re-direct examination, Detective Bunting again looked at the surveillance footage in State's exhibit 33 and compared the second person on the

13.

scene with Delvin Parks from Officer Bryson's camera and, based on the location of the person and the physical similarities, believed it to be Delvin Parks. Also according to the surveillance video, Parks is seen trying to render aid to T.T. after he is shot. Detective Bunting stated that there was never any indication that Parks was the shooter.

{¶ 33} Also upon cross-examination, Detective Bunting admitted that, although the vehicle in the video in which the shooter got into and drove away was "very similar" to the vehicle registered to Jackson, he could not state for certain that they were the same vehicle. When Jackson's vehicle was searched, no firearms, shell casings, or ammunition, were found in the vehicle. And the detective agreed that there was "never any sort of issue, confrontation, [or] beef between [T.T.] and [Jackson]" and that there had been an incident several days or weeks before where N.J.'s ex-husband went over to Torie Betts' house looking for her.

## B. Criminal Rule 29 Motion

{¶ 34} At the conclusion of the State's case, the defense made a Crim.R. 29 motion for dismissal of each count in the indictment. Jackson's attorney argued each count, out of order.

{¶ 35} Regarding Count Four, discharge of a firearm on or near a prohibited premises, the defense argued that there was no evidence that Jackson fired a firearm over or across a public road, street or highway, pointing to the video where it was alleged you could see "most, if not all" of the shots were fired at close range, and not across a street or from the street. And although N.J. testified that she had been shot at, there was no

14.

evidence that the "gun was fired towards her as she was running down or across the street" and there was no evidence of any projectile recovered from or across Avondale.

{¶ 36} With respect to Count Two, felonious assault against N.J., defense counsel contended that there was no evidence of any shot fired in N.J.'s direction.

{¶ 37} Defense counsel maintained that the State did not present a prima facie case of attempted murder, as it related to Count Three, because, although there was evidence that a shooting occurred, and that T.T. was struck multiple times, those shots were fired "from a distance of at least five to six feet" and there was "no testimony that any of those shots were fired at close range or in a manner to suggest that, in fact, what this individual intended to do, that being to commit the act of murder."

{¶ 38} Lastly, with regard to Count One, felonious assault against T.T., it was argued that there were "discrepancies as far as the identification of individuals that [were] on the surveillance video."

{¶ 39} The State countered, with respect to Count Four, the spent shell casings found in the roadway are evidence that those rounds were fired upon a public road or highway. Regarding Count Two, felonious assault against N.J., the State referred the court to N.J.'s statements in the 911 call indicating "he had shot at her specifically several times such that she was fleeing, she ran out of her shoes, she was hiding, she was whispering," as well as to Detective Miller and Officer Billinghurst that she had been shot at, and the State maintained that some of the shots could not be seen because they were made outside of the area captured by the surveillance video. The State also

suggested that shots fired from Jackson in the street are "consistent with him firing at [N.J.] who's down the street."

{¶ 40} Relating to Count Three, the attempted murder charge, the State argued that Jackson "shot [T.T.] basically pointblank when he initially exited that home, directly striking [T.T] in his chest" and that Jackson kept firing at him when he was on the ground.

{¶ 41} The State disputed Jackson's arguments regarding identity by noting that all of the witnesses who viewed the video indicated that it was Jackson.

{¶ 42} The court denied Jackson's Crim.R. 29 motion, finding that the State had met its burden with regard to each count. The court did note that "there are shell casings that are far enough out of range to correlate to shots being in the roadway."

### C. Defense Case and Verdict

{¶ 43} The defense did not present any witnesses at trial. On January 27, 2023, the jury found Jackson guilty of each individual count and firearm specification.

### IV. Sentencing

{¶ 44} At sentencing, the court first considered Jackson's conviction in Michigan, and the parties agreed that it was an offense that the court is able to look at when considering the RVO specification. The court then found Jackson guilty of the RVO specification attached to Count 3.

16.

**{¶ 45}** Count 1 (felonious assault as to T.T.) and Count 3 (attempted murder) were merged and the State elected to go forward with Count 3. Prior to issuing her sentence, the judge made the following statement regarding the crime:

When I see the two people that are at the bottom of the steps they're clearly not people that are aware that they're in danger. They're not people that had just rushed out of the house. They are two people having a conversation.

. . .

When that door explodes open, Mr. Jackson, and what I believe we witnessed, and what the jury found, was you coming out of that door, and within feet and inches, like it's - - it's two steps directly down from the door, you are shooting at point blank range at these two people. How you are not standing here for a murder charge is pure dumb luck. Your record other than the Michigan charge is not a horrible record, but your reaction with guns explains that they are ready at hand and you use them.

The gentleman that was shot wasn't - doesn't appear to have been known to you for any animosity, was not a person that at least as testimony was given was not somebody that had been a life agitant for you and was not in anyway creating a dangerous situation.

I think there's arguments that State can make on felonious assaults that they could probably always take it to a level of an attempt murder in some of these shootings, but sometimes when you get to witness the actual effort somebody takes it reached another level for me, because he is -- he is shot immediately at those steps.

He goes to what -- looking out of the house would be his right -- or from the house to the right, would have been his left, to the ground, at which point you start shooting again.

He manages to get up because you're interrupted by your girlfriend, and she's trying to get you out of there, and he is stumbling now away in another direction, so we've got two separate shooting sections, and you leave in the car.

And then you appear back in the screen. And you go after him again. And again, just the mere fact that somehow a major organ didn't get hit, he didn't die, but the effort you went to that day -- and only you know why. That's not part of the trial. Only you know why. -- certainly could have led to murder, and absolutely are the worst form of what I would see an attempt murder be in the fact patterns that we have before us.

You went to such great lengths to keep going after him and keep shooting him, and, again, there is one person in the room that can completely understand what was happening that night.

We got to see what was on the screen. No words. But you were at a heightened level of effort to shoot at this person.

The female was shot at close range and wasn't hit, and thank goodness for that. But to watch this whole scenario, to look at your record after the fact and realize, really it's not the worst record I have ever seen, I watched a young man throw his whole life away.

And it's hard to fathom what caused your decisions that night. Obviously you took this to trial which was within your right, but the elements were met on these cases based on the evidence that came in.

{¶ 46} The court then sentenced Jackson to the following: 5 to 7 1/2 years in prison for Count 2, plus an additional mandatory and consecutive 3 years for the firearm specification; for Count 3, 11 to 16 1/2 years in prison plus an additional mandatory and consecutive 3 years for the firearm specification and 5 years for the RVO specification; 36 months in prison for Count 4 with a 3-year firearm specification; 36 months for Count 5 with a mandatory 1-year firearm specification to run consecutive to the firearm specifications in Counts 2 and 3. The court ordered Counts 2, 3 and 5 to be served consecutively, and Count 4, including the attached firearm specification, to be served concurrently to Counts 2, 3, and 5.[2]

---

[2] The appealed judgment entry states that these sentences result in "a total stated minimum prison term of 31 years with a maximum indefinite term of 36 1/2 years." Both parties have declared that the maximum indefinite term should be 39 years, and that State has suggested that this "miscalculation" can be corrected by a nunc pro tunc entry. We note that this issue has not been raised as an assignment of error, and therefore, is not

**{¶ 47}** The court made the following findings in support of the consecutive sentences at the sentencing hearing:

> Court does find as to consecutive sentencings it is necessary to protect the public from future crime to [sic] punish the Defendant, is not disproportionate to the seriousness of the Defendant's conduct. The Defendant was on a Michigan release on his sentence.
>
> The harm caused in this scenario and the efforts taken to shoot the male victim was so great and unusual that no single prison term for any portion of the offense committed or the course of conduct adequately reflects the seriousness of the offense, and based on the prior violent history the Court does find that the criminal history, while there are not a significant amount of charges, the charge

---

before us for consideration. *See* App.R. 12(A)(1)(b), *Gilliam v. Rucki*, 2023-Ohio-1413, ¶ 27 (6th Dist.). Moreover, it does not appear that the trial court's calculation was an error. R.C. 2929.144(B)(2) states that, "If the offender is being sentenced for more than one felony, if one or more of the felonies is a qualifying felony of the first or second degree, and if the court orders that some or all of the prison terms imposed are to be served consecutively," the maximum term is equal to the total of "all of the minimum terms imposed on the offender under division (A)(1)(a) or (2)(a) of section 2929.14 of the Revised Code for a qualifying felony of the first or second degree that are to be served consecutively and all of the definite terms of the felonies that are not qualifying felonies of the first or second degree that are to be served consecutively . . . *plus fifty per cent of the longest minimum term or definite term for the most serious felony being sentenced*." (Emphasis added.) The parties agree the minimum would be 31 years. Under the formula, only fifty percent of the longest minimum term or definite term for the most serious felony - here this would be the 5 1/2 years for the attempted murder - should be added to the minimum 31 years. Therefore, the trial court's calculation of 36 1/2 years is correct.

that is most significant is of a violent nature similar to what is before the Court.

And the Court finds that that criminal history requires consecutive sentencing.

{¶ 48} Similar findings were set forth in the judgment entry journalized February 22, 2023.

{¶ 49} Jackson appealed.

## V. First Assignment of Error

{¶ 50} Jackson contends that the trial court erred in denying his Crim.R. 29 motion for acquittal.

## A. Standard of Review

{¶ 51} "The standard of review for a denial of a Crim.R. 29 motion is the same as the standard of review for sufficiency of the evidence." *State v. Johnson*, 2014-Ohio-2435, ¶ 11 (6th Dist.), citing *State v. Carter*, 1995-Ohio-104. When reviewing the sufficiency of the evidence, our function is to examine the trial evidence to determine "whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 1997-Ohio-355, fn. 4.

21.

**B. Jackson's Crim.R. 29 motion was properly denied.**

*Identity of the Shooter*

{¶ 52} Jackson first argues that the trial court erred in denying his motion as the State did not prove that he was the shooter. He contends that T.T. was still "highly medicated" when he picked Jackson's picture in the photo array, that T.T. had consumed alcohol on the night of the incident, that there was no prior relationship between the two men that would have facilitated the identification, and there was another gentleman at the party, of similar height and build, with long dreadlocks and wearing similar clothes.

{¶ 53} The State disputes the contention that Jackson was not proven to be the shooter, pointing to statements made by T.T. and N.J., as well as to the video.

{¶ 54} We find that there was an abundance of evidence that, when looked at in a light most favorable to the prosecution, would have allowed a rational trier of fact to determine Jackson was the shooter. Both N.J. and T.T. identified "Jermaine" as the shooter, after having spent time with him immediately prior to the shooting, and T.T. picked Jackson's picture out of a photo array with 100% confidence. Also, there was no evidence that either N.J. or T.T. was overly intoxicated on the night of the incident, or that T.T. was so medicated at the time of the photo array that he was unable to make an accurate identification.

{¶ 55} Further, there is testimony that the shooter left prior to the arrival of the police, and yet, the second man, who was similar in appearance to Jackson, was still at the scene of the shooting when the police arrived.

22.

*Felonious Assault Against N.J.*

{¶ 56} With respect to the felonious assault charge relating to N.J. (Count 2), Jackson maintains that there is no evidence in the video that the shooter "even aimed his firearm in even the general direction that [N.J.] had run." He points out that N.J. ran to the left of the screen in the video and there is no "evidence that the shooter ever left the screen in that direction, or stood in the street and fired after her." Instead, the video shows the shooter running to the right of the screen, and does not show the shooter firing down the street. He argues that the video also does not show the shooter shooting at N.J. as she was standing at the bottom of the steps.

{¶ 57} The State counters that, although she did not testify, N.J. can be heard stating that "Jermaine" shot her in the 911 tape, and she also made such statements to Detective Miller. The State also points to the shell casings in the road, specifically the casings at placards 4 and 1, as evidence that "at least one shot, and likely more, were fired from the roadway in N.J.'s direction, outside the view of the camera."

{¶ 58} We find there is evidence supporting a finding that Jackson feloniously assaulted N.J. The record contains statements made by N.J. in the 911 tape, as well as to Detective Miller and Officer Billinghurst, that "Jermaine" shot at her. These statements are not contradicted by the events shown in the video. On the video, when T.T. is shot while the shooter is coming out of the door, N.J. is standing next to T.T. Additionally, there is a period of time on the video where the shooter is off-screen and therefore his actions are not visible. During a portion of the time the shooter is off-screen, N.J. can be

23.

seen running down the middle of the street.  We find any rational trier of fact, when viewing this evidence in a light most favorable to the State, could have found the essential elements of felonious assault as to N.J to be proven beyond a reasonable doubt.

*Discharge of a Firearm On or Near a Prohibited Premises*

{¶ 59} R.C. 2923.162(A)(3) prohibits a person from discharging a firearm "upon or over a public road or highway."  Jackson argues there is no evidence that the shooter discharged a weapon over or upon a public road or highway.  He points to the video, which he contends does not show the shooter entering the roadway or shooting over the roadway toward a victim.  The State counters that the shell casings found in the street, most specifically the shell casings found at placard 4, which was approximately 6 to 8 feet into the street, and placard 1, which was found "at the far west end of the driveway and in the street," are evidence that at least one, if not more shots were fired from the roadway.  The State maintains that the video does not show all 12 shots that were fired, and thus, some were fired outside of the view of the camera.  Pointing to the testimony of Detective Jackson that "'[v]irtually all' semi-automatic handguns eject casings up, to the right, and slightly to the rear," the State concludes that the casings at placards 1 and 4 were fired from the roadway.  Citing to *State v. Bulger*, 2018-Ohio-5346 (8th Dist.) and *State v. Zander*, 2010-Ohio-631, ¶ 33 (9th Dist.), the State asserts that "[p]hysical evidence regarding the location of the shell casings found at a crime scene, has been found to support testimony regarding the identity of a shooter and a determination of where those shots were fired."  In his reply, Jackson insists that "the location of shell

casings is not dispositive of the location of the shooter when shots are fired," and suggests the casings "could have inadvertently been moved by the victim, as he struggled to stand."

{¶ 60} Here we cannot find that the trial court erred in denying the Crim.R. 29 motion regarding this charge. First, it appears in the video that the shooter may have momentarily stepped into the roadway. However, even if he is not in the roadway in the video, there is evidence in the record when viewed in a light most favorable to the State, that could allow a rational trier of fact to find that at least one shot was fired on or over the roadway. There are numerous shell casings in the roadway, including one six to eight feet into the road; the shooter is out of view of the camera numerous times; and N.J. runs down the middle of the road and during some of the time she is in the road, the shooter is off-screen.

*Attempted Murder*

{¶ 61} R.C. 2903.02(A), states that "[n]o person shall purposely cause the death of another. . ." A person can be found guilty of attempted murder if that person purposely or knowingly engages "in conduct that, if successful, would constitute or result in the offense." R.C. 2923.02(A) "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶ 62} Jackson contends that there was not sufficient evidence to convict him of attempted murder. He concedes that T.T. was "shot multiple times by a shooter who was

standing within several feet" of T.T., but suggests that this evidence does not show that the shooter purposefully intended murder because "if the shooter actually intended to kill [T.T.], he had multiple, close range chances to do so" and thus, the shooting was intended to cause harm, but not death. Jackson also claims that the fact that there is no evidence that there was any sort of grudge between Jackson and T.T. is evidence that there was not any attempt to inflict death.

{¶ 63} The State disputes this argument and asserts that "[a] person acts 'knowingly' to purposely cause another's death or to cause serious physical harm when they point a gun at someone and pull the trigger," regardless of where the victim is shot, citing to *State v. Campbell*, 2014-Ohio-493, ¶ 34 (8th Dist.).

{¶ 64} The video shows T.T. being shot at repeatedly at close range, and in fact, he was hit repeatedly, including in the stomach. We find this sufficient to allow any rational trier of fact, when viewing this evidence in a light most favorable to the State, to find Jackson knowingly engaged in conduct that, if successful, would have resulted in the death of T.T.

{¶ 65} For these reasons, we find Jackson's first assignment of error not well-taken.

### VI.  Second Assignment of Error

### A. Standard of Review

{¶ 66} Although we have found that the trial court did not err in denying Jackson's Crim.R. 29 motion as his convictions were supported by sufficient evidence, we may

26.

nonetheless find that the jury's verdict was against the manifest weight of the evidence. *State v. Herrera*, 2022-Ohio-4769, ¶ 37 (6th Dist.), citing *State v. Thompkins,* 1997-Ohio-52. Where the sufficiency of the evidence standard "examines whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *Id*., citing *State v. Wilson*, 2007-Ohio-2202, ¶ 25.

{¶ 67} In determining whether Jackson's conviction is against the manifest weight of the evidence, we must review the record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and decide, in resolving any conflicts in the evidence, whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Prescott*, 2010-Ohio-6048, ¶ 48 (6th Dist.), citing *Thompkins*. We do not view the evidence in a light most favorable to the State; rather, we "sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Lewis*, 2022-Ohio-4421, ¶ 22 (6th Dist.), quoting *State v. Robinson*, 2012-Ohio-6068, ¶ 15 (6th Dist.). "Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the fact-finder's credibility determinations, given that it is the finder of fact that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor."

27.

*State v. Brooks*, 2023-Ohio-2978, ¶ 13 (6th Dist.), citing *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.).

{¶ 68} Only in "the exceptional case in which the evidence weighs heavily against the conviction" is a conviction reversed on manifest weight grounds. *Id*. at ¶ 12, quoting *Thompkins*.

**B. The Jury's Verdict Was Not Against The Manifest Weight of the Evidence.**

{¶ 69} Here, Jackson makes the same arguments with regard to manifest weight as he did for sufficiency of the evidence. After reviewing these arguments under the manifest weight standard, we cannot find that the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

*Identity of the Shooter*

{¶ 70} Jackson contends that the conclusion that Jackson was the shooter was not supported by the manifest weight of the evidence, making the same arguments as he made with regard to sufficiency of the evidence. In response, the State again points to the video, as well as to statements made by T.T. and N.J.

{¶ 71} As discussed above, both N.J. and T.T. identified "Jermaine" as the shooter, and T.T. picked Jackson's picture out of a photo array with 100% confidence. There is no evidence that N.J. or T.T.'s consumption of alcohol on the night at issue affected their identifications, nor is there evidence that T.T. was so medicated during the

28.

photo array that his choice in the photo array was suspect. Further, there is no evidence that the second man at the scene, Delvin Parks, was the shooter.

{¶ 72} Based on this evidence, we find that the trier of fact could reasonably conclude that Jackson was the shooter. We cannot find the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

*Felonious Assault Against N.J.*

{¶ 73} As with sufficiency of the evidence, here Jackson also argues that there is no evidence that Jackson shot in N.J.'s direction and therefore contends that his conviction of felonious assault with respect to N.J. is against the manifest weight of the evidence. The State again argues points to N.J.'s statements in the record that "Jermaine" shot at her, and relies upon the casings in the street as evidence that shots were fired from the roadway in N.J.'s direction.

{¶ 74} As we stated previously, N.J. made repeated statements that "Jermaine" shot at her. Additionally, she was standing at the bottom of the stairs with T.T. when the shooter came out of the door and began firing, and she can be seen running down the middle of the road, including while the shooter is off-screen. We find this evidence supports the jury's finding of that Jackson feloniously assaulted N.J., and therefore, we cannot find the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

29.

*Discharge of a Firearm On or Near a Prohibited Premises*

**{¶ 75}** Again, Jackson maintains that the video does not show him shooting over or towards the roadway. He suggests that the shell casings in the roadway are "unpersuasive" given "the proximity of the victim to the street when he collapsed," and that the casings' locations "do[] not rise to the level of proof beyond a reasonable doubt that the shooter was shooting in the street." The State once more relies upon the location of the shell casings at placards 1 and 4 and the fact that the shooter was outside of the video range during portions of the video.

**{¶ 76}** We cannot find the jury lost its way in evaluating the evidence, determining the credibility of the witnesses, and drawing inferences from the evidence such that the conviction must be reversed and a new trial ordered. As discussed above, it appears that Jackson may have stepped into the roadway briefly in the video, and even if not, we believe, based upon the location of the shell casings, the fact that the shooter was out of camera range for a portion of the video, and the fact that N.J. was running down the middle of the street while the shooter was out of purview of the video, that Jackson's conviction on the charge of discharging a weapon on or near prohibited premises was not contrary to the manifest weight of the evidence.

*Attempted Murder*

**{¶ 77}** Jackson repeats his claim that the evidence only showed an intent to harm T.T., not to kill him, and the State reiterated its arguments in response. We find that the jury could reasonably conclude that Jackson had the requisite intent to cause T.T's death

30.

from the fact that there is evidence that Jackson fired a gun at T.T. and struck him numerous times. Therefore, we do not find Jackson's conviction for attempted murder was against the manifest weight of the evidence.

{¶ 78} Jackson's second assignment of error is therefore not well-taken.

## VII. Third Assignment of Error

### A. Standard of Review

{¶ 79} Here Jackson alleges that the trial court failed to merge all appropriate sentences on the basis that they were allied offenses of similar import. We review de novo a trial court's ruling as to whether offenses should be merged as allied offenses of similar import under R.C. 2941.25. *State v. Smith*, 2023-Ohio-866, ¶ 10 (6th Dist.), citing *State v. Bailey*, 2022-Ohio-4407, ¶ 6.

### B. Applicable Law

{¶ 80} The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, which is applied to Ohio citizens through the Fourteenth Amendment, as well as Article I, Section 10 of the Ohio Constitution, protect against, inter alia, multiple punishments for the same offense. *State v. Ruff,* 2015-Ohio-995, ¶ 10. R.C. 2941.25 codifies when multiple punishments can be imposed, and states that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

31.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 81} Due to the fact that "the prosecution selects the charges that may be brought based upon the criminal conduct of an accused and that conduct may potentially support convictions of multiple offenses," it must be determined "whether the conduct of the accused can be construed to constitute a single or more than one offense." *Ruff* at ¶ 13. Because R.C. 2941.25 focuses on a defendant's conduct, it is dependent upon the facts of a particular case. *Id.* at ¶ 26.

{¶ 82} We ask three questions when determining whether Jackson's conduct supports multiple offenses: "(1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation." *Ruff* at ¶ 31. An affirmative answer to any of these questions will allow separate convictions. *Id.* The defendant bears the burden to establish that R.C. 2941.25 prohibits multiple punishments. *State v. Washington*, 2013-Ohio-4982, ¶ 18.

### C. The Trial Court Properly Merged All Appropriate Sentences

{¶ 83} Jackson argues that his conviction for having a weapon under disability should have been merged into his convictions for felonious assault and attempted murder as "it did not require any action by Jackson, other than his obtaining possession of a

32.

firearm, and arguably engaging in the shooting incident …" He contends that there was no separate harm as the only harm was T.T.'s injuries, and they were "not multiplied or changed in any way by the fact that [Jackson] had a prior felony" and additionally the crimes were not committed separately or with a separate animus or motivation.

{¶ 84} The State first asserts that Jackson did not raise this objection at trial and thus, this claim can only be reviewed for plain error. Jackson does not dispute plain error review. Under the doctrine of plain error, Jackson must show "that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal [is] necessary to correct a manifest miscarriage of justice." *State v. West*, 2022-Ohio-1556, ¶ 22, quoting *State v. Quarterman*, 2014-Ohio-4034, ¶ 16. The State then contends that the outcome would not have been otherwise as the crimes have different harms and were committed with separate animus, and therefore merger is not appropriate.

{¶ 85} Here we find no plain error, and that the offenses are not allied offenses such that merger was required. We recently considered whether the offense of having a weapon under disability must merge with the offense of felonious assault and determined that "the animus of having weapons under disability is making a conscious choice to possess a weapon. Felonious assault requires a conscious choice to attack someone using a weapon." *State v. Gilmer*, 2024-Ohio-1178, ¶ 89 (6th Dist.), quoting *State v. Frazier*, 2021-Ohio-4155, ¶ 2 (2d Dist.). We find the same analysis applies here.

33.

**{¶ 86}** Therefore, we find no plain error.  The trial court correctly sentenced Jackson separately for having a weapon while under a disability.  Jackson's third assignment of error is denied.

### VIII.  Fourth Assignment of Error

### A.  Standard of Review

**{¶ 87}** We review felony sentences under R.C. 2953.08(G)(2).  *State v. Purley*, 2022-Ohio-2524, ¶ 8 (6th Dist.).  R.C. 2953.08(G)(2) allows an appellate court to increase, reduce, or otherwise modify a sentence, or vacate the sentence and remand for resentencing if the court finds by clear and convincing evidence that either of the following apply: (1) "the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code" or (2) "the sentence is otherwise contrary to law."   Here, we consider whether the record does not support the trial court's findings under R.C. 2929.14(C)(4).

### B.  R.C. 2929.14(C)(4)

**{¶ 88}** Pursuant to R.C. 2929.41(A), "a prison term, jail term, or sentence of imprisonment shall be served concurrently with any other prison term, jail term, or sentence of imprisonment" unless an applicable exception applies.  The exception at issue in the present case is found in R.C. 2929.14(C)(4), which reads as follows.

> If multiple prison terms are imposed on an offender for convictions of
> multiple offenses, the court may require the offender to serve the prison

34.

terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶ 89}** A trial court imposing consecutive sentences must make these findings at the sentencing hearing and incorporate them into its sentencing entry, but is not obligated to state reasons supporting its findings. *State v. Bonnell*, 2014-Ohio-3177, syllabus.

35.

## C. The Record Supports the Imposition of Consecutive Sentences

{¶ 90} Jackson argued that the court should consider his consecutive sentences in light of *State v. Gwynne*, 2022-Ohio-4607 ("*Gwynne IV*") and consider the aggregate total length of his sentence. In that case, the court concluded that when making its consecutive sentence findings pursuant to R.C. 2929.14(C)(4), a trial court "must consider the number of consecutive sentences it intends to impose and the aggregate sentence that will result from those consecutive sentences." *Id*. at ¶ 13. The court also held that the "evidentiary standard for changing the trial court's order of consecutive sentences is not deference to the trial court; the evidentiary standard is that the appellate court, upon a de novo review of the record and the findings, has a 'firm belief' or 'conviction' that the findings—the criteria mandated by the legislature to be met before the exception to concurrent sentences can apply—are not supported by the evidence in the record." (Emphasis deleted.) *Id.* at ¶ 23.

{¶ 91} However, after the briefing in the current case was completed, the Ohio Supreme Court reconsidered, and vacated *Gwynne IV*. *State v. Gwynne*, 2023-Ohio-3851 ("*Gwynne V*"). In *Gwynne V*, the Ohio Supreme Court held that de novo review is contrary to the statutory language. *Id.* at ¶ 16. Instead, the court relied on the language in R.C. 2953.08(G)(2) that an appellate court may only increase, reduce, or otherwise modify consecutive sentences if the record does not "'clearly and convincingly' support the trial court's R.C. 2929.14(C)(4) consecutive sentence findings." *Id.* at ¶ 13. The court defined "clear and convincing evidence" as "'that measure or degree of proof which

36.

is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *Id.* at ¶ 14, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. The court directed an appellate court that "it must have a firm belief or conviction that the record does not support the trial court's findings before it may increase, reduce, or otherwise modify consecutive sentences." *Id*. at ¶ 15.[3]

{¶ 92} Here, the trial court made the findings required by R.C. 2929.14(C)(4) both at the sentencing hearing and in its judgment entry. As we do not have a "firm belief or conviction" that the trial court's findings are not supported by the record, we find Jackson's fourth assignment of error not-well taken.

---

[3] Due to the change in the law, on November 6, 2023, we allowed the parties to file supplemental briefs "addressing the impact of the decision, if any on this case." Both parties filed supplemental briefs. Jackson filed supplemental briefs on November 13 and 15, 2023, however, we found these supplemental briefs did not comply with our November 6, 2023 order, and they were stricken.

37.

## IX. Conclusion

{¶ 93} The judgment of the Lucas County Court of Common Pleas is affirmed.

Pursuant to App.R. 24, Jackson is hereby ordered to pay the costs incurred on appeal.

                                                            Judgment affirmed.

        A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.
*See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.                     _____
                                                                        JUDGE

Myron C. Duhart, J.           
CONCUR.                       _____
                                                                        JUDGE


Gene A. Zmuda, J.         
CONCURS AND WRITES          _____
SEPARATELY                     JUDGE


**ZMUDA, J.**

{¶ 94} I concur with the majority affirming the trial court's judgment. However, I write separately because I would find appellant's fourth assignment of error not well-taken based on the analysis set forth in *State v. McIntoush*, 2024-Ohio-2284 (6th Dist.) regarding appellate review of consecutive sentences.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.