[Cite as *State v. Boyd*, 2025-Ohio-3248.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

| | |
|---|---|
| State of Ohio | Court of Appeals No.  OT-24-022 |
| | OT-25-023 |
| Appellee | Trial Court No.  2022 CR 003 |
| | 2022 CR 100 |
| v. | |
| Markum M. Boyd | **DECISION AND JUDGMENT** |
| Appellant | Decided:  September 9, 2025 |

* * * * *

James J. VanEerten, Ottawa County Prosecuting Attorney,
and Thomas A. Matuszak, Assistant Prosecuting Attorney, for appellee.

Michael H. Stahl, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} Appellant, Markum M. Boyd, appeals from a judgment entered by the
Ottawa County Court of Common Pleas convicting him of multiple drug-related offenses
following a jury trial. For the reasons that follow, the trial court's judgment is affirmed.

**Statement of the Case**

{¶ 2} The Ottawa County grand jury returned an indictment charging Boyd with six felonies stemming from a January 2, 2022 traffic stop: Count One, trafficking in cocaine, in violation of R.C. 2925.03(A)(2) and (C)(4)(g), a felony of the first degree; Count Two, aggravated trafficking in drugs (methamphetamine – Schedule II), in violation of R.C. 2925.03(A)(2) and (C)(1)(f), a felony of the first degree; Count Three, trafficking in a fentanyl-related compound, in violation of R.C. 2925.03(A)(2) and (C)(9)(h), a felony of the first degree; Count Four, possession of cocaine, in violation of R.C. 2925.11(A) and (C)(4)(f), a felony of the first degree; Count Five, aggravated possession of drugs, in violation of R.C. 2925.11(A) and (C)(1)(e), a felony of the first degree; and Count Six, possession of a fentanyl-related compound, in violation of R.C. 2925.11(A) and (C)(11)(g), a felony of the first degree. All six of those charges included specifications that appellant was a major drug offender pursuant to R.C. 2941.1410(B) and for the forfeiture of $2,300.00 pursuant to R.C. 2941.1417(A).

{¶ 3} Boyd was arraigned on January 18, 2022. He then filed a motion to suppress all evidence and statements that were obtained following the search and seizure of a blue duffle bag that was in the trunk of the stopped vehicle. Boyd based the motion on alleged violations of his Fourth Amendment rights. An evidentiary hearing was held on the matter, and in a judgment entry journalized on August 11, 2022, the trial court denied the motion to suppress.

2.

{¶ 4} On January 9, 2023, the State filed a written request for jury instructions on possession, ownership, constructive possession, joint possession, and complicity. On the third day of trial, defense counsel objected to the complicity instruction, arguing that there was no evidence to support the charge of complicity and, therefore, providing the instruction would confuse the jury. The trial court -- unpersuaded by defense counsel's argument -- overruled the objection and provided all of the State's requested instructions.

{¶ 5} On February 23, 2024, the State filed a notice of intent to use cell phone evidence obtained from a forensic extraction of Boyd's cell phone. Boyd responded by filing a liminal motion to exclude all cell phone evidence.

{¶ 6} Trial was held before a jury on March 18-20, 2024 and the jury unanimously found Boyd guilty as charged.

{¶ 7} At a sentencing hearing held on April 16, 2024, the trial court sentenced Boyd to serve an aggregate prison term of 15 to 20.5 years.

{¶ 8} Appellant timely appealed his convictions.

## Statement of the Facts

## Suppression Hearing

{¶ 9} The trial court held the suppression hearing. The State presented Trooper Race Baker as its only witness. Boyd did not testify nor call any witnesses or admit any evidence.

{¶ 10} Trooper Baker testified that on January 2, 2022, he was engaged in stationary patrol on State Route 2, observing both eastbound and westbound traffic. At

3.

approximately 10:15 p.m., he observed a Chevy Impala traveling eastbound toward him. Using his laser unit, he checked the vehicle's speed at 63 mph in a 55 mph zone. As the vehicle passed him, it slowed dramatically to 52 mph, a deceleration of 11 mph. At first, he let the vehicle travel down the road and get out of view. He then pulled out of his stationary location and pursued the vehicle.

{¶ 11} When Trooper Baker caught up to the Chevy Impala, he manually activated his dashboard-mounted, front-facing camera. The camera captured the bulk of Trooper Baker's encounter with the Chevy Impala and its occupants. As testified to by Trooper Baker -- and as demonstrated in the video -- the following events took place. Trooper Baker activated his overhead lights, and the Chevy Impala rolled to a stop. Dispatch revealed that the Chevy Impala was registered to a rental car company.

{¶ 12} Trooper Baker greeted the front seat occupants, notified them of the reason for the stop, and asked for a driver's license, registration, and proof of insurance. He was informed that the car was a rental. During this encounter with the front seat occupants, he noticed that the back seat passenger was lying down across the rear row of seats.

{¶ 13} Trooper Baker asked for the rental agreement, and the driver, Ashley Brown, stated that she did not have it and that she left it at home. Trooper Baker asked Brown to step out of the vehicle, and he escorted her to his patrol car, where he placed her in the front seat.

{¶ 14} Brown told Trooper Baker that her dad had rented the vehicle for her and that she could ask her dad to text her the rental agreement. Trooper Baker retrieved

4.

Brown's phone from the rental car and, upon returning to his cruiser, handed the phone to Brown. Trooper Baker asked Brown whether the rental agreement might be in the center console of the car, and Brown responded that her dad "keeps them in his email."

{¶ 15} Trooper Baker returned to the rental vehicle and asked the front seat passenger, Stacy Walters, if the rental agreement was in the center console. She answered no. Trooper Baker noticed that Boyd remained in the rear seat, in the same position as before, appearing to be asleep. At the same time, Trooper Baker detected the odor of burnt marijuana emanating from the vehicle.

{¶ 16} Trooper Baker returned to his patrol car. At this point, he was transitioning the inquiry from a traffic investigation to a criminal investigation, and so he radioed dispatch to get another unit on the scene. He asked Brown whether she was able to get the rental agreement. A couple of minutes later, Brown provided Trooper Baker with an electronic copy of the rental agreement, which she had received on her phone from her father.

{¶ 17} Trooper Baker told Brown he could smell marijuana in the rental car, and she admitted that there was some in the vehicle, stating, "It's just a little bit. It's a roach." Brown also admitted the roach was hers. Trooper Baker told her that he was going to write her a warning.

{¶ 18} Approximately five minutes later, a deputy from the Ottawa County Sheriff's Department appeared on the scene to assist Trooper Baker. When Trooper Baker and the deputy returned to the rental vehicle, Trooper Baker observed that Boyd

5.

was now sitting up and was on his cell phone. Walters and Boyd were asked to step out of the vehicle. Boyd was put in the back of the deputy's car. At one point, Trooper Baker noticed that Boyd was using FaceTime to communicate with someone on his cell phone. Trooper Baker asked Boyd to give up the cell phone while the officers investigated. Boyd argued with him and refused to relinquish his phone. Eventually, Trooper Baker grabbed the phone and snatched it from Boyd's hands.

{¶ 19} Trooper Baker began a search of the front seat area of the passenger compartment of the vehicle. He discovered a burnt marijuana cigarette near the center console in a Newport cigarette pack, and he discovered a gram of raw marijuana bud in a second cigarette pack. He stated that he was able to smell the odor of raw marijuana within the passenger compartment of the vehicle. On cross-examination, Trooper Baker specified that the odor of raw marijuana came from the second cigarette pack.

{¶ 20} Trooper Baker next began to search the rear seat area of the passenger compartment of the vehicle. There he found a glass tube containing an unlit marijuana cigarette. Next, Trooper Baker folded down the rear seat and saw a blue duffel bag in the trunk. He said that the duffel bag was readily accessible to the vehicle's rear passenger.

{¶ 21} Trooper Baker walked to the rear of the vehicle and unzipped the duffel bag. At the top of the bag was a plastic "Foot Locker" bag containing multiple smaller plastic baggies, each of which held a white crystalline substance that Trooper Baker identified as methamphetamine. In addition, there was a vacuum-sealed plastic bag that contained a white and yellow powder, which Trooper Baker identified as fentanyl. A

6.

third plastic bag was found to contain a block of white powder, which Trooper Baker identified as cocaine. Also discovered in the duffel bag were a couple of small jars of marijuana and some men's clothing.

{¶ 22} Following this discovery, Boyd, Brown, and Walters were all taken into custody and Mirandized. During a search of Boyd incident to his arrest, Trooper Baker discovered more marijuana and $2,300 in U.S. currency. Boyd denied having any knowledge about the property that was discovered in the trunk of the rental car.

{¶ 23} Trooper Baker testified that while he investigated the traffic offense, he mentally catalogued a number of observations that led him to believe that the occupants of the Chevy Impala might be engaged in criminal conduct. Those observations, or "criminal factors" as Trooper Baker called them, are as follows. First, there was the "dramatic change" in driving behavior as the Chevy Impala passed Trooper Baker's location. The car slowed from 63 mph to 52 mph and then continued down the road at that significantly slowed speed. According to Trooper Baker, the typical driver speeds up again once he or she is out of the view of law enforcement.

{¶ 24} Another observation was that the Chevy Impala was a rental car. Trooper Baker explained that rental cars are frequently used by criminals to avoid forfeiture when a vehicle is used in connection with a crime.

{¶ 25} Next, Trooper Baker noticed that upon his initial approach Brown was smoking a freshly lit cigarette and Walters was "frantically trying to light" one. Trooper Baker testified that cigarettes are often used as a masking agent to cover up the odor of

7.

alcohol or drugs. He noted that Walters's hands were visibly shaking as she tried to light her cigarette, despite the fact that she had no reason to be nervous about the speeding offense because she was not the driver who had committed the offense.

{¶ 26} Another circumstance of interest was that the renter of the Chevy Impala was not present. And although Brown said that she did not have a copy of the rental agreement because she had left it at home, Trooper Baker later found the rental agreement in Brown's wallet, which was located underneath the rental car driver's seat.

{¶ 27} Next, Trooper Baker noticed that Brown exited the Chevy Impala with a lit cigarette but without her coat, which was odd given the cold weather. When Brown got into the front seat of Trooper Baker's patrol car, she put her head down and appeared to be talking to herself.

{¶ 28} Brown initially told Trooper Baker that they were going to Virginia, but she later corrected herself and said West Virginia. Brown also stated that she was taking her "cousin" to Virginia, which, in Trooper Baker's experience can occur when a person claims to know someone they might not actually know.

{¶ 29} In addition, Brown told Trooper Baker that the car had been rented in Jackson, Michigan, and that from there it took about five-and-a-half hours to get to Virginia. Trooper Baker knew, however, that Virginia was about an eight-hour drive from the western portion of Ohio. Although Brown said that her dad had rented the vehicle, she did not initially provide her father's name.

8.

{¶ 30} Brown said she and her companions were going to Morgantown, West Virginia. Trooper Baker recounted that a fellow trooper who had conducted a traffic stop on a rental vehicle that was coming from Michigan and going to Morgantown, West Virginia, had discovered a "large amount" of narcotics in that vehicle. In addition, Trooper Baker himself had previously stopped a vehicle heading to Morgantown, West Virginia, and had found the vehicle to contain one-and-a-half kilos of methamphetamine.

{¶ 31} When Trooper Baker approached the Chevy Impala a second time in order to get Brown's phone, he noticed that Boyd still appeared to be asleep in the back seat. In Trooper Baker's experience, it was unusual for an adult to remain asleep following a traffic stop and police interaction with the vehicle's occupants. He testified that on a prior occasion when he encountered a passenger who feigned sleep, it was discovered that the person had a felony warrant out for his arrest.

{¶ 32} When Trooper Baker asked front-seat passenger Walters for her identification, she questioned him and was hesitant to provide her information. When she was asked where the group was headed, Walters -- contradicting Brown -- told Trooper Baker that they were going to Michigan. Trooper Baker noted that the rental car, when stopped, had been traveling eastbound, away from Michigan.

{¶ 33} By the time Trooper Baker had returned to his patrol car for the second time, he believed that some other criminal activity was afoot. Brown told Trooper Baker that they were going to West Virginia for a court appearance the next day, but she did not know what the court appearance was for. Trooper Baker considered it unusual that Brown

9.

was texting her father instead of just calling him and asking him to send her a copy of the rental agreement.

{¶ 34} When Trooper Baker approached the rental car for a third time to see if Walters could help find a copy of the rental agreement, Boyd remained prone in the back seat.

{¶ 35} Twelve minutes and 42 seconds into the encounter, Trooper Baker was still attempting to determine if the occupants of the rental car were lawfully in possession of it or if the rental car had been stolen. It was at this time that he smelled the odor of burnt marijuana coming from within the rental vehicle and mentally transitioned his inquiry from a traffic investigation to a criminal investigation.

## Jury Trial

### Boyd's liminal motion concerning cell phone evidence

{¶ 36} At the outset of the trial, counsel for the parties discussed with the court Boyd's liminal motion. In this motion, Boyd sought to exclude, among other things, screen shots of text messages that were received on Boyd's cell phone. Ultimately, the trial court determined that the text messages were relevant to show Boyd's "knowledge of drug lingo," "which might go to his knowledge that there were…narcotics in the car."

### Boyd's opening statement

{¶ 37} During a brief opening statement, counsel for Boyd asked the jury to consider why the State's witnesses (Brown and Walters) "are testifying the way they

10.

are," but claimed that it was not a question of finger-pointing, but rather a question of weighing the credibility of the witnesses.

**The State's case-in-chief**

{¶ 38} During its case-in-chief, the State called seven witnesses: 1) Ashley Brown; 2) Stacy Walters; 3) Trooper Race Baker; 4) Sergeant Ryan Randall; 5) Trooper Ryan Stewart; 6) Keith Ferguson; and 7) Taylor Britton.

**Ashley Brown**

{¶ 39} Brown was a 37-year-old single mother of two, who lived in Jackson, Michigan. She stated that Stacy Walters was her cousin, that Boyd was the father of two of Walters's children, and that Brown had known Boyd for about five to ten years.

{¶ 40} Brown testified that her father had rented her a Chevy Impala for her birthday weekend and that she made a first trip from Jackson, Michigan, to Morgantown, West Virginia, together with Walters, on December 31, 2021. She stated that the purpose of that trip was to retrieve Walters's car, because the plates on that vehicle had expired. On the drive back, Boyd, who had been in Morgantown, allegedly rode with Walters in her car.

{¶ 41} Brown testified that on January 1, 2022, she received two phone calls from Walters, and that during the second call, Walters handed her cell phone to Boyd, who then asked Brown to give him a ride back to West Virginia. Brown testified that Boyd first offered her a couple hundred dollars, then changed the amount to $500, and then $700, at which point Brown agreed to drive him.

11.

{¶ 42} Brown picked up Boyd and Walters at Walters's house. Brown stated that when she arrived, Boyd put a duffel bag in the trunk of her rental car. Brown never asked Boyd what was in the duffel bag, and Boyd never told her. When they left Walters's house, Brown was driving, Walters was in the front passenger seat, and Boyd was in the rear seat behind Walters. Brown testified that they made a brief stop in Detroit, where Boyd went into a house while Brown and Walters stayed in the rental car. According to Brown, the duffel bag remained in the trunk, undisturbed.

{¶ 43} After the three of them left Detroit, they headed toward Morgantown, West Virginia, and were pulled over by a state trooper in Ottawa County, Ohio. Brown testified that just before the stop, Boyd was awake in the back seat, talking with Walters about the trip. During the traffic stop, Brown gave police consent to search her rental car.

{¶ 44} Brown testified that she was "absolutely" surprised when the police discovered a large amount of drugs in the trunk. Brown promptly told the police that the duffel bag did not belong to her and that Boyd had gotten into her vehicle with the bag. Brown cooperated with the police. She let them look in her cell phone and she voluntarily interviewed with Trooper Ryan Stewart.

{¶ 45} Eventually, the police allowed Brown to leave with the rental car and her cell phone, and they returned the duffel bag to Walters after they removed the drug evidence.

12.

**Stacy Walters**

{¶ 46} Stacy Walters was Brown's cousin and the mother of three children, two of whom she had with Boyd. Walters testified that she had known Boyd for approximately 17 years.

{¶ 47} Walters testified that in late December 2021, around New Year's Eve, Brown drove her to Morgantown, West Virginia so that she could pick up her 2019 Jeep Cherokee. Brown drove her there in Brown's rental car. When Walters drove her own car back from Morgantown to Jackson, Michigan, Boyd rode with her.

{¶ 48} Soon after returning to Jackson, Boyd asked Walters to call Brown to ask for a ride back to Morgantown. Walters called Brown and then let Boyd speak with her. Brown agreed to give Boyd a ride back to Morgantown.

{¶ 49} Brown picked up Boyd and Walters at Walters's home. Walters testified that she did not bring any luggage, because it was to be a round trip. She further testified that when Boyd got into the rental car, he put a duffel bag in the trunk. Walters stated that Boyd did not tell her what was in the duffel bag and that she did not ask, because she thought it was just clothes. She further stated that when they made a stop in Detroit, Boyd got out of the car, but he left the duffel bag in the trunk. Walters testified that she never got into the bag or tried to control it.

{¶ 50} When the three left Detroit that night, Brown was driving, Walters was in the front passenger seat, and Boyd was in the back. Ultimately, police found drugs in the duffel bag in the trunk. Like Brown, Walters cooperated with the police. She spoke with

13.

the police and stated that she was honest with them. In addition, she allowed the police to look in her cell phone. The police did not find anything incriminating in her cell phone.

{¶ 51} Eventually, the police let Walters leave with Brown in Brown's rental car, and they gave Walters the duffel bag, along with the clothing that had been discovered within it. Walters identified the clothing in the duffel bag as belonging to Boyd. Walters stated that after she got home, she put the clothes in her closet, because she did not know what else to do with them. She said that she ultimately ended up giving them to her son, because he was about the same size as Boyd.

{¶ 52} When asked on direct examination why the jury should believe her claim that the drugs in the duffel bag had nothing to do with her, she stated, "Because I'm telling the truth. It didn't have nothing to do with me. I told the truth in, back in that case and I'm telling the truth now."

**Trooper Race Baker**

{¶ 53} During his trial testimony, Trooper Baker recounted most of the same facts about which he had testified during the suppression hearing, including the litany of "criminal factors" he had noted, which involved not just Boyd, but also Brown and Walters. He mentioned the fact and significance of: 1) Brown's driving behavior on the highway, including the drastic speed change; 2) Brown's and Walters's freshly lit cigarettes at the time of the stop; 3) the stopped car's status as a rental vehicle; 4) Brown's initial misstatement about going to Virginia; 5) Walters's misstatement about going to Michigan; 6) Brown's actions in texting rather than phoning her father; and 7)

14.

the smell of burnt marijuana in the car. Trooper Baker especially highlighted the fact that Boyd had feigned sleep during the majority of the traffic stop but suddenly awoke and got on his cell phone when the deputy sheriff arrived to serve as backup. Trooper Baker testified that during his 10-year career as a trooper, he had experienced only one other occasion where an adult appeared to be sleeping during a traffic stop, and on that occasion it was discovered that the adult had an active felony warrant for his arrest.

{¶ 54} Trooper Baker also highlighted the fact that when he told Boyd he could not use his cell phone while under investigative detention, Boyd ignored him and continued to use his phone. Boyd was FaceTiming with someone who was giving him advice about the police encounter, telling Boyd that "they can't do that." Boyd continued to argue with Trooper Baker, refusing to get off his phone. After about two minutes of arguing, Trooper Baker "snatched" Boyd's cell phone from him and put it on the front seat of the deputy sheriff's cruiser, while Boyd was detained in the back. Trooper Baker described Boyd as "uncooperative" during the encounter.

{¶ 55} Trooper Baker then began his search of the rental car, beginning with the passenger compartment. He explained that the trunk could be accessed from the rear passenger compartment by folding down one of the back seats, and that when he did that, he was able to see the duffel bag.

{¶ 56} When he opened the duffel bag, he discovered a large quantity of drugs. In all, Trooper Baker discovered five one-pound bags of methamphetamine, a block of cocaine that weighed approximately 125 grams, and a vacuum-sealed baggie with two

balls of fentanyl that weighed approximately 200 grams. The only other things in the duffel bag were articles of men's clothing, such as shirts and jeans.

{¶ 57} Trooper Baker testified that both Brown and Walters told him at the scene of the traffic stop that the duffel bag belonged to Boyd. He further testified that when he searched Brown and Walters, he did not find anything such as cash or drugs, but when he searched Boyd, he found a small baggie of marijuana and approximately $2,300 in cash. Trooper Baker explained to the jury that traffickers finance the sale of drugs with cash.

{¶ 58} In response to Boyd's questions as to why certain items of evidence had not been tested for fingerprints or DNA, Trooper Baker explained that even if those items had been tested for such things, and even if Boyd's fingerprints and DNA had been discovered on incriminating pieces of evidence, scientists still could not say when or how those fingerprints or DNA got onto those items.

**Trooper Ryan Stewart**

{¶ 59} Trooper Stewart confirmed that the amount of drugs seized in this case was not for personal use but rather was "definitely trafficking weight." He also explained that drug traffickers almost exclusively use cash to facilitate their business because it leaves no paper trail.

{¶ 60} When police seized the drugs in this case, Trooper Stewart was called in to interview the three occupants of the rental car.

{¶ 61} Trooper Stewart interviewed Walters for a total of approximately 25-30 minutes. She told him that she had known Boyd for about 13 years and that they had

16.

children together and spoke frequently. She confirmed that they had been traveling from Jackson, Michigan to West Virginia. During her interview, she let Trooper Stewart look through her cell phone. Trooper Stewart noted that during his interview with Walters, she was guarded but not evasive, she answered questions, and she never asserted her constitutional rights.

{¶ 62} Trooper Stewart also interviewed Brown. He stated that she was very emotional -- both visibly and audibly upset -- because she had been put in this situation. But she answered his questions without evasion and never invoked her constitutional rights. She explained her earlier trip to Morgantown, West Virginia and the current trip from Jackson, Michigan to Morgantown. Trooper Stewart confirmed that Brown allowed him to go through her cell phone.

{¶ 63} Finally, Trooper Stewart described his interview with Boyd, which lasted about 10 to 15 minutes. According to Trooper Stewart, Boyd "was evasive on the questions about the contraband that was found, whose it was, who was responsible for it, with a lot of indirect questions or indirect answers pertaining to the questions [Trooper Stewart] had asked him." Based on the first two interviews with Walters and Brown, Trooper Stewart's belief was that Boyd had "all or most responsibility for the, the drugs at the time." He stated that he wanted to gain Boyd's cooperation, because his goal was "to work up the ladder, to get to the higher food chain people." Ultimately, Trooper Stewart terminated the interview because he and Boyd were "going around in circles." He knew he "wasn't going to get anywhere with what [he] was trying to achieve, so [he]

17.

ended it." Trooper Stewart noted that during the interview Boyd's cell phone kept receiving alerts that were visible on his lock screen from people who were trying to contact him, including an individual who was saved in Boyd's phone as "Ven."

{¶ 64} During cross-examination, Trooper Stewart confirmed that Brown and Walters were eventually released on the night of the drug seizure. He characterized their release as a "group decision." Police gave Brown and Walters the rental car and the duffel bag that still contained the clothing inside.

{¶ 65} Trooper Stewart then explained that, based on the interviews and the fact that both Brown and Walters had said that Boyd put the duffel bag into the trunk of the rental car, no further investigation had been done in terms of fingerprint or DNA evidence. Trooper Stewart did not think that further investigation of the men's clothing was pertinent, because Boyd was the only male in the car. Trooper Stewart then explained why, in his experience, it would have been a futile gesture for law enforcement personnel to attempt to test certain items of evidence for fingerprints or DNA.

**Sergeant Ryan Randall**

{¶ 66} Sergeant Ryan Randall applied for and obtained a search warrant to conduct a forensic extraction of Boyd's seized cell phone. As a result, Boyd's cell phone was sent to the Ohio State Highway Patrol's Computer Crimes Unit for forensic extraction.

**Analyst Keith Ferguson**

{¶ 67} Keith Ferguson is a forensic computer specialist with the Ohio State Highway Patrol. He explained how he conducted the forensic extraction of Boyd's cell phone, whose contents were eventually analyzed by Taylor Britton.

**Analyst Taylor Britton**

{¶ 68} Taylor Britton is an intelligence analyst with the Ohio State Highway Patrol. He analyzed the forensic extraction from Boyd's cell phone, which was the subject of Boyd's liminal motion. Britton looked through Boyd's messages, contacts, internet search history, photos, and location data. Based upon the trial court's motion in limine rulings, Britton limited his testimony to the data that was contained in Boyd's cell phone for the eight days leading up to the seizure in this case, that is, from December 25, 2021, through January 2, 2022.

{¶ 69} Britton tallied the number of incoming and outgoing calls and identified the top ten most frequently used numbers for that eight-day period. The most used number was involved in 146 calls. The third most used number, which belonged to Walters, was involved in 113 calls.

{¶ 70} Britton also analyzed Boyd's GPS data, which tracked Boyd's travel near Morgantown, West Virginia, his trip from Morgantown to Jackson, and the balance of his return trip from Jackson to Ottawa County. The GPS data corroborated Brown's and Walters's testimony.

19.

{¶ 71} Finally, Britton identified several text messages sent to Boyd's cell phone that used coded drug language. According to Britton, people who are engaged in drug trafficking seldom use proper names such as cocaine, fentanyl, acetylfentanyl, carfentanyl, or heroin.

{¶ 72} Relying on his personal knowledge and experience, Britton identified several text strings that used coded language, such as "girl" and "boy," "half," and "green." Britton translated those terms for the jury. He also identified several text messages that were sent to Boyd using such terms, but to which Boyd never responded, suggesting that Boyd understood the coded language. For example, prior to the stop, someone texted Boyd, "Can you help me with like a 40 or a half until later? I'm detoxing so bad. And Ashton is about to be going for his day report assessments." Also prior to the stop, someone texted Boyd, "Yo, both the girl and the boy wasn't any good. For real, I'm not lying, man. So hit me up when you get something else better." During the traffic stop, "Ven" texted Boyd, "I need that up if you got it." Also during the traffic stop, "Ven" texted Boyd, "Let me know. Got people waiting. I'll wait for a few minutes before I start calling around."

**Crim.R. 29 motion**

{¶ 73} At the conclusion of Boyd's case-in-chief, Boyd moved for a judgment of acquittal under Crim.R. 29. The basis for the motion was that the State Patrol had returned the duffel bag and men's clothing, which "had probative evidence," to Walters, who "apparently by the charges of this case wasn't the owner." The State opposed the

20.

motion, noting that such was not an appropriate basis for a Crim.R. 29 motion, and the trial court denied the motion.

**Complicity instruction**

{¶ 74} On the morning of the third day of trial, the trial court met with Boyd and counsel for the parties and reviewed jury instructions. The trial court stated that it intended to provide a complicity instruction to the jury. The trial court noted Boyd's objection, stating:

> [Defense counsel] objects to that. He points out that no witness has explicitly taken the stand and said that there was fault on the part of the two women who were in the car on January 2d with Mr. Boyd. They were released by the Highway Patrol. The duffle bag was returned to one of them. And in that circumstance, as I understand it, Mr. Wittenberg doesn't think that this part of the charge ought to be given.

Defense counsel confirmed the court's understanding of the objection, stating, "I think the Court is accurate insofar as you've gone."

{¶ 75} The State argued in support of the instruction, pointing out that the defense had presented the theory that Boyd was somehow innocent and that someone else was culpable -- either Walters or Brown, or perhaps other unnamed "players" for which Boyd was the middleman.

{¶ 76} The trial court overruled Boyd's objection, stating:

> I'll overrule the objection and will give the complicity in committing a crime portion of the charge as drafted. As I've said to Counsel informally when we chatted about this in chambers a little while ago, I'm concerned about the inference that the jury might draw that because they were present, Ms. Walters and Ms. Brown could have had

21.

knowledge and could have some legal culpability, and that they were simply trying to layoff responsibility on Mr. Boyd. That would be negated by telling them, as we try to do here, that even if other people are involved as complicitors or aiders and abettors, that doesn't provide a defense for Mr. Boyd.

**Closing arguments**

{¶ 77} The State, in its closing argument, asked the jury to consider the effect of the text messages on Boyd, particularly in light of the fact that he never responded by asking what they meant. In other words, the State argued, the text messages showed that Boyd "spoke the language" of drug trafficking.

{¶ 78} The State also asked the jury to consider the jury instructions regarding actual possession, constructive possession, joint possession, complicity, and reasonable doubt. Regarding the question of doubt, the State asked the jury to distinguish between mere possible/imaginary doubt as opposed to reasonable doubt because the State anticipated that Boyd would re-cast possible/imaginary doubt as reasonable doubt during his closing argument and, in so doing, would blame Brown and Walters for the drugs that were seized from the trunk of the rental car.

{¶ 79} Defense counsel explained in closing argument that the State wanted the jury to believe either that the testimony of Brown and Walters was truthful and credible or that they were aiders and abettors. He argued that "if allegations are made as to Stacy Walters and Ashley Brown, it's a result of the evidence, not because I'm finger-pointing at them or saying anything other than what the evidence showed." In support of this statement, Boyd pointed out that many of the "criminal factors" cited by Trooper Baker

22.

involved Brown and Walters, and not Boyd. He also pointed out that police returned the bag to Walters, suggesting that the bag and its contents belonged to her. Finally, defense counsel stated:

> If you conclude either or both of these witnesses were more than merely present, that is that they were accomplices because they shared knowledge and intent to break the law, then you are advised under Ohio law, testimony by an accomplice should be viewed with grave suspicion and weighed with great caution. The testimony of an accomplice does not become inadmissible because of the complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of an accomplice may affect their credibility and require that it be weighed with great caution.

{¶ 80} The State responded to Boyd's arguments as follows:

> Everything in this case points to the Defendant as the one who was calling the shots. Whether or not Stacy and Ashley were involved is not relevant to your determination of the charges against the Defendant. The only thing that's relevant is whether or not you believe he acted knowingly, he possessed those drugs in some fashion, actual possession, constructive possession, or joint possession…and that he had those drugs with the intent for them to be sold or resold by himself or another.

**Jury instructions**

{¶ 81} The trial court provided the jury with standard complicity instructions. For each count, the trial court instructed the jury that they could find Boyd guilty either as a principal offender who acted alone or as a complicitor who acted knowingly with others. The trial court specified that "the mere presence of a person at the scene of an offense is not sufficient to prove, in and of itself, that they were an aider and abettor. There must be

23.

some substantial and overt act committed to make someone an aider and abettor, or that shows beyond a reasonable doubt their knowing complicity in committing a crime."

{¶ 82} Of Brown and Walters, the trial court -- recalling that the two women had testified that they were traveling in the automobile with Boyd on the evening of January 2, 2022, and that they had "some knowledge of events that occurred"-- told the jury that the "[o]ne or both women may have been knowingly and voluntarily involved in illegal conduct, or one or both may have had no knowledge and any criminal activity and no intent to break the law." The trial court advised the jury that if it concluded that either or both witnesses were more than merely present and were, instead accomplices, their testimony, although admissible, should be viewed with grave suspicion and weighed with great caution.

**Jury verdicts**

{¶ 83} Following deliberations, the jury returned with unanimous guilty verdicts on all six counts.

**Sentencing**

{¶ 84} At sentencing, the trial court found that the charge for trafficking in cocaine merged with the charge for possession of cocaine; the charge for aggravated trafficking in drugs merged with the charge for aggravated possession of drugs; and the charge for trafficking in a fentanyl-related compound merged with the charge for possession of a fentanyl-related compound. In each instance, the State elected to proceed with sentencing on the related trafficking charge.

24.

## Assignments of Error

{¶ 85} On appeal, Boyd asserts the following assignment of error:

I.     The trial court erred in failing to suppress evidence seized as a result of the unlawful detention of Markum Boyd.

II.    The conviction is insufficient of evidence and contrary to the manifest weight of the evidence.

III.   The trial court erred in permitting hearsay and character evidence to be admitted over objection.

IV.    The trial court erred in giving a complicity instruction in this case over objection.

## Law and Analysis

**The trial court did not err when it denied Boyd's motion to suppress.**

{¶ 86} "'Appellate review of a motion to suppress presents a mixed question of law and fact.'" *State v. Donaldson*, 2019-Ohio-232, ¶ 14 (6th Dist.), quoting *State v. Burnside*, 2003-Ohio-5372, ¶ 8. "When the trial court considers a motion to suppress, it acts as the factfinder and is in the best position to resolve factual questions and to evaluate the credibility of witnesses." *Id.*, citing *Burnside* at ¶ 8. "We accept the trial court's findings of fact if they are supported by competent, credible evidence, but we must independently determine whether the facts satisfy the applicable legal standard without deferring to the trial court's legal conclusions." *Id.*

{¶ 87} Here, the parties do not dispute that Trooper Baker was constitutionally permitted to initiate the traffic stop for a speeding violation. They also do not dispute that Trooper Baker was constitutionally permitted to detain the rental car and its occupants

25.

until he had obtained and processed the driver's license, registration, and proof of insurance from Brown, whose father had rented the car. It is not even disputed that Trooper Baker's detection of the odor of burnt marijuana emanating from the passenger compartment of the rental car established probable cause to search the passenger compartment of the car. The issue, as articulated in Boyd's first assignment of error, is whether Trooper Baker had probable cause to further search the trunk of the car and its containers.

{¶ 88} The Supreme Court of Ohio has established that "[a] trunk and a passenger compartment of an automobile are subject to different standards of probable cause to conduct searches." *State v. Farris*, 2006-Ohio-3255, ¶ 51. "Probable cause for an extended search of an automobile exists where, based on the totality of the circumstances, there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *State v. Beavers*, 2007-Ohio-2915, ¶ 11 (8th Dist.), quoting *State v. Steen*, 2004-Ohio-2369, ¶ 5 (9th Dist.), quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983). In *Farris*, the Ohio Supreme Court found that the odor of burnt marijuana in the passenger compartment of a vehicle justifies a search of the passenger compartment but does not itself justify an extended search to the trunk of a car. *Farris* at ¶ 52. The *Farris* court, concluding there were no factors to justify an extended search of the defendant's vehicle, expressly noted that, except for the "light odor of marijuana," the police had found no "other contraband" within the passenger compartment. *Id.*

26.

{¶ 89} Here, it was discovery of actual, physical marijuana in the passenger compartment, together with the numerous "criminal factors" that were enumerated by Trooper Baker -- and not just the odor of burnt marijuana or even the odor of raw marijuana emanating from the cigarette pack -- that gave Trooper Baker probable cause to search the rest of the car, including the trunk, where Trooper Baker could see by way of his search of the passenger compartment that there existed a duffel bag that was accessible to anyone seated in the back seat.[1] *See State v. Price*, 2013-Ohio-130, ¶ 18 (6th Dist.) (under the totality of the circumstances, which included the discovery of a small amount of marijuana and a black bag that smelled of marijuana upon a search of the passenger compartment, there was probable cause to search the trunk of the vehicle);*see also State v. Boykins*, 2024-Ohio-5898, ¶ 17 (4th Dist.) (discovery that defendant possessed illegal drugs in her vehicle gave trooper probable cause to search the entire vehicle); *State v. Lynn,* 2018-Ohio-3335, ¶ 19 (12th Dist.) (discovery of a small amount of marijuana and pills in vehicles glove compartment provided officers with probable cause to extend search to vehicle's trunk); *Beavers* at ¶ 12 (discovery of contraband in

---

[1] Although in cases going forward there may now be some question as to whether the smell of marijuana or even the presence of marijuana -- whose medical and recreational possession and use has been legalized in Ohio -- is alone sufficient to establish probable cause, because non-medical marijuana was still illegal in Ohio at the time of the traffic stop in this case and because Trooper Baker relied on other factors to determine that he had probable cause to believe that he would find contraband in the rental vehicle, we need not address the matter here. *See State v. Tomlin*, 2024-Ohio-4710, ¶ 24-25 (2d Dist.) (because non-medical marijuana was illegal in Ohio at time of traffic stop, any detection of the odor of marijuana would give probable cause to search); *State v. Wright*, 2024-Ohio-1763, ¶ 26-27 (1st Dist.) (in light of other factors, there was no need to decide whether police dog's sniff and alert, standing alone, provided probable cause to search).

27.

plain view on a vehicle's middle console gave police probable cause to search the entire car, including the trunk); *State v. Greenwood*, 2004-Ohio-2737, ¶ 10-12 (2d Dist.) (observation of marijuana on the passenger seat and floorboard gave officer probable cause to believe that the vehicle contained contraband; thus, the officer was entitled to search the entire vehicle, including the trunk).

{¶ 90} Further, "when officers have 'probable cause to search for contraband in a car, it is reasonable for police officers…to examine packages and containers without a showing of individualized probable cause for each one.'" *State v. Malone*, 2022-Ohio-1409, ¶ 31 (4th Dist.), quoting *Wyoming v. Houghton*, 526 U.S. 295, 320 (1999); *accord State v. Vega*, 2018-Ohio-4002, ¶ 16 (officer could lawfully open sealed envelope located inside vehicle when officer possessed probable cause to search vehicle); *see also Boykins* at ¶ 17 (once trooper had probable cause to search the entire vehicle, he could search anywhere where evidence could be concealed, including the defendant's purse); *Greenwood* at ¶ 11 (probable cause to search entire vehicle permitted search of trunk and its contents). Thus, Trooper Baker could lawfully search not just the trunk of the car, but also the duffel bag that was contained within. Accordingly, Boyd's first assignment of error is found not well-taken.

**The convictions are based on sufficient evidence and are not against the manifest weight of the evidence.**

{¶ 91} Boyd argues in his second assignment of error that his convictions are "insufficient of evidence and contrary to the manifest weight of the evidence."

28.

{¶ 92} "Sufficiency of evidence is a term of art for applying the legal standard to determine whether the evidence is legally sufficient to support the verdict as a matter of law." *Toledo v. Manning*, 2019-Ohio-3405, ¶ 13 (6th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "The test for sufficiency is one of adequacy, or 'whether the evidence, if believed, can sustain the verdict as a matter of law.'" *State v. Kimble,* 2025-Ohio-310, ¶39 (6th Dist.), quoting *Manning* at ¶ 12, citing *State v. Myers*, 2018-Ohio-1903, ¶ 132. "Indeed, in making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses." *Kimble* at ¶ 39, citing *State v. Walker*, 55 Ohio St.2d 208, 212 (1978).

{¶ 93} By contrast, in determining whether Boyd's conviction is against the manifest weight of the evidence, we must review the record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and decide, in resolving any conflicts in the evidence, whether the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Prescott*, 190 Ohio App.3d 702, 2010-Ohio-6048, ¶ 48 (6th Dist.), citing *Thompkins* at 387. "We do not view the evidence in a light most favorable to the State; rather, we 'sit as a "thirteenth juror" and scrutinize "the factfinder's resolution of the conflicting testimony."'" *State v. Jackson,* 2024-Ohio-2419, ¶ 67 (6th Dist.), quoting *State v. Lewis*, 2022-Ohio-4421, ¶ 22 (6th Dist.), quoting *State v. Robinson*, 2012-Ohio-6068, ¶ 15 (6th Dist.). "Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the fact-

29.

finder's credibility determinations, given that it is the finder of fact that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor." *State v. Brooks*, 2023-Ohio-2978, 2023 WL 5500445, ¶ 13 (6th Dist.), citing *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.).

{¶ 94} In this case, Boyd claims that the State failed to prove that he had constructive possession of the duffel bag, because the bag also contained clothing that fit Walters's son and because the bag was ultimately returned to Walters. He further claims that "[n]o effort was made to independently identify the owner of the bag, or [to] associate it with" Boyd.

{¶ 95} As indicated above, the possession related offenses merged with the associated trafficking offenses, and the State elected to proceed to sentencing on the trafficking offenses, all of which were the result of Boyd's violation of R.C. 2925.03(A)(2).

{¶ 96} Under R.C. 2925.03(A)(2):

> (A)   No person shall knowingly do any of the following:
>
> …
>
> (2)   Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person.

{¶ 97} Recently, this court held that "[t]he plain language of R.C. 2925.03(A)(2) does not require that an offender be in 'possession' of the controlled substance at the time they are arrested for trafficking in order to be convicted." *State v. Stuart*, 2025-Ohio-2420, ¶ 23 (6th Dist.).

> To require the state to show that the offender had possession of the controlled substance would create an absurd result that would allow a drug trafficker to prepare controlled substances for delivery, arrange for their transport, and facilitate their sale, but avoid criminal liability because they were not found in possession of those substances.

*Id.* Thus, in this case, as in *Stuart*, the State was not obligated to present evidence that Boyd had actual or constructive possession of the duffel bag, but only that he knowingly transported the bag containing controlled substances intended for sale or resale. At trial, the State presented evidence sufficient to support the trafficking charges in the form of testimony by Brown and Walters that Boyd placed the fully-packed duffel bag in the trunk of Brown's rental vehicle.

{¶ 98} Not only was Boyd's conviction based on sufficient evidence, it was also supported by the manifest weight of the evidence. We disagree with Boyd's suggestion that the jury clearly lost its way or created a manifest miscarriage of justice when it apparently accepted the "extraordinarily self-serving" testimony of Brown and Walters. "'Although we consider the credibility of witnesses in a manifest weight challenge, we are mindful that the determination regarding witness credibility rests primarily with the trier of fact because the trier of fact is in the best position to view the witnesses and

31.

observe their demeanor, gestures, and voice inflections -- observations that are critical to determining a witness's credibility.'" *State v. Bentz,* 2017-Ohio-5483, ¶ 98 (3d Dist.), quoting *State v. Williams,*2013-Ohio-573, ¶ 31 (8th Dist.). The jury -- who was repeatedly cautioned that any accomplice testimony should be viewed with grave suspicion and weighed with great caution -- was free to accept or reject any or all of Brown's and Walters's testimony concerning Boyd's having placed the duffel bag in the trunk. *See id.*

{¶ 99} To the extent that Boyd argues that the State provided insufficient evidence relating to the possession offenses, we note that the trial court did not impose sentence on those offenses and, therefore, any claims regarding sufficiency or weight of the evidence as to those offenses are not properly before us. *See State v. Powell*, 2024-Ohio-5122,¶ 13-15 (2d Dist.); *State v. Volpi*, 2023-Ohio-4488, ¶ 125-127 (11th Dist.); *State v. Cottrell*, 2023-Ohio-3932, ¶ 22 (12th Dist.).

{¶ 100} For the foregoing reasons, Boyd's second assignment of error is found not well-taken.

**The trial court abused its discretion when it admitted forensic extraction evidence from Boyd's cell phone, but the error was harmless.**

{¶ 101} Boyd argues in his third assignment of error that the trial court erred in permitting hearsay and character evidence in the form of forensic extraction evidence from Boyd's cell phone. "'Decisions involving the admissibility of evidence are reviewed under an abuse-of-discretion standard of review.'" *State v. Urbanek*, 2023-Ohio-2249, ¶ 62 (6th Dist.), citing *Estate of Johnson v, Randall Smith, Inc.*, 2013-Ohio-1507, ¶ 22,

32.

citing *State v. Hancock*, 2006-Ohio-160 "'Similarly, decisions granting or denying a motion in limine are reviewed under an abuse-of-discretion standard of review.'" *Urbanek* at ¶ 62, citing *Illinois Controls, Inc. v. Langham*, 70 Ohio St.3d 512, 526 (1994).

{¶ 102} Boyd argues that the trial court abused its discretion when it admitted forensic evidence from Boyd's cell phone because the evidence constituted inadmissible hearsay and character evidence. In response, the State argues that this evidence -- in the form of text messages that were sent to Boyd by various third parties -- showed Boyd's knowledge, which was an essential element of all six offenses charged in this case.

{¶ 103} Evid.R. 801(C) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." "But a statement is not hearsay when offered for a purpose other than to prove the truth of the matter asserted, e.g., to show its effect on the listener." *State v. Crocker*, 2015-Ohio-2528, ¶ 50 (4th Dist.). In addition, "'[q]uestions and commands are not statements covered under the hearsay rule.'" *State v. Fitts*, 2020-1154, ¶ 34 (6th Dist.), quoting *United States v. Ellis*, E.D. Mich. No. 12-CR-20228, 2013 WL 2285457, *2 (May 23, 2013). "Multiple courts have held that text messages received on a defendant's cell phone are not hearsay when the messages are not offered for the truth of the matter asserted." *State v. Norris,* 2016-Ohio-5729, ¶ 32 (2d Dist.), citing *Crocker* and *State v. Miller*, 2015-Ohio-330, ¶ 17 (1st Dist.).

33.

{¶ 104} According to Boyd, the text messages that were sent to him were offered for their truth. In his brief, he highlights the text message that stated "Yo, both the girl and the boy wasn't any good. For real, I'm not lying, man. So hit me up when you get something else better." Another of the text messages stated, "Can you help me with like a 40 or a half until later? I'm detoxing so bad. And Ashton is about to be going for his day report assessments." A third text message said, "I need that up if you got it." And the fourth said, "Let me know. Got people waiting. I'll wait for a few minutes before I start calling around."

{¶ 105} Ignoring the texted questions and commands, which are not statements covered under the hearsay rule, we are left with little more than the statement that "both the boy and the girl wasn't any good." The truth of whether or not the "boy" and "girl" to which the sender was referring was good is clearly of no consequence in this case.

{¶ 106} Next, Boyd argues that the text messages were impermissibly advanced to establish his knowledge through propensity, in violation of Evid.R. 404(B). Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show conformity therewith." *See also State v. Hartman*, 2020-Ohio-4440, ¶ 20-21. "'Other acts' evidence, however, may be admissible for other limited purposes including "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *State v. Kryling*, 2023-Ohio-1921, ¶ 49 (6th Dist.), citing Evid.R. 404(B). "'The key is that the evidence must

prove something other than the defendant's disposition to commit certain acts.,'" *Id.*, citing *State v. Kamer,* 2022-Ohio-2070, ¶ 129 (6th Dist.), citing *Hartman* at ¶ 22.

{¶ 107} To determine whether "other acts" evidence is admissible requires a specific procedural analysis. First, the evidence must meet a two-pronged relevance requirement; that is, evidence must be relevant to (1) "the particular purpose for which it is offered – i.e., a non-character-based purpose, as allowed by Evid.R. 404(B)"; and (2) "an issue that is actually in dispute – i.e., an issue that is material to the case as required by Evid.R. 401." *Kamer* at ¶ 130, citing *State v. Smith*, 2020-Ohio-4441, ¶ 37-38. If the evidence satisfies this relevancy requirement, its admissibility is determined under Evid.R. 403(A), which states that relevant evidence "is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." *See Kryling* at ¶ 50.

{¶ 108} Whether a trial court erred in determining that "other acts" evidence was admissible under Evid.R. 404(B) is a question of law that is subject to de novo review. *Id.* at ¶ 51, citing *Kamer* at ¶ 132, citing *State v. Worley*, 2021-Ohio-2207, ¶ 117. The trial court's weighing of the probative value of admissible evidence against the danger of unfair prejudice is reviewed for abuse of discretion. *Id.,* citing *Kamer* at ¶ 132, citing *Hartman* at ¶ 30.

{¶ 109} In this case, we need not complete this analysis, because Boyd is correct in his assertion that the State did not satisfy the prerequisites of Evid.R. 404(B) to even allow the trial court to entertain the admission of the disputed evidence.

35.

{¶ 110} "When a party seeks to admit 'other acts' evidence pursuant to Evid.R. 404(B), the rule explicitly requires that party to 'provide reasonable notice of any such evidence the proponent intends to introduce at trial so that an opposing party may have a fair opportunity to meet it' and 'articulate in the notice the permitted purpose for which the proponent intends to offer the evidence, and the reasoning that supports the purpose.'" *Kryling* at ¶ 52, citing Evid.R. 404(B)(2)(a) and (b).

{¶ 111} Thus, it was incumbent upon the State to identify which of the excepted purposes identified in Evid.R. 404(B)(2) it intended to rely on to introduce the otherwise inadmissible "other acts" evidence. In this case, the record demonstrates that the State's only argument for admission of the "other acts" evidence was to show that Boyd had knowledge of various coded drug terms -- a reason that is clearly not identified as an exception under Evid.R. 404(B).

{¶ 112} Here, the evidence showed that a text sent to Boyd on December 26, 2021, contained the words "boy" and "girl." The State presented expert witnesses who wrote a report indicating that "boy" is slang for heroin or crack cocaine, and "girl" is slang for cocaine, heroin, or fentanyl. In addition, the State presented a Highway Patrol forensic report showing that cocaine and fentanyl were in the duffel bag that was confiscated on January 22, 2022. But the State did not identify any connection between the drugs that were found in the duffel on January 2, 2022, and the December 26, 2021 texts that allegedly referred to drugs.

36.

{¶ 113} The mere fact that someone sent Boyd texts containing code words for drugs in no way establishes that Boyd knew there were drugs in the duffel bag that was found in the car. In equating a person's understanding of drug terminology to the probability of that person committing a crime, the State makes a propensity argument of the kind that Evid.R. 404(B) is designed to eliminate. "'The key is that the evidence must prove something other than the defendant's disposition to commit certain acts.'" *State v. Hawks*, 2025-Ohio-23, ¶ 32 (5th Dist), quoting *State v. Hartman*, 2020-Ohio-4440, ¶ 22.

{¶ 114} A case on point is *State v. Jones*, 2021-Ohio-2621 (6th Dist.), wherein this court similarly found that the State had made a propensity argument in violation of Evid.R. 404(B). *Id.* at ¶ 78. In *Jones*, the State offered evidence of the appellant's previous drug arrests as evidence that the appellant "knowingly possessed drugs under similar circumstances." In determining that the trial court's decision to admit that evidence was in error, we stated:

> Essentially, the state's logic is that because appellant is a drug dealer, he must have known that the drugs were in the van. However, aside from appellant's propensity to be involved in drug activity, the 2001 drug arrest and the 2019 controlled delivery have no bearing on whether appellant had knowledge that the drugs were in the storage compartment of the van on January 3, 2017; the evidence of those other acts does not show that appellant had knowledge that the specific drugs existed, or that appellant placed those drugs in the van.

{¶ 115} As in *Jones*, at no point, either at trial or in this appeal, did the State properly seek to introduce the statements for one of the purposes identified in Evid.R.

37.

404(B)(2). This failure to comply with the rule compels a finding by this court that the trial court erred in admitting the "other acts" evidence. *See Kryling* at ¶ 53.

{¶ 116} Having determined that the trial court erred in admitting coded text messages that did not reference the specific drugs that were at issue in this case, we must now determine whether the error was harmless. *See id.* at ¶ 54, citing *State v. Moore*, 2021-Ohio-765, ¶ 37 (6th Dist.). Harmless error is "any error, defect, irregularity, or variance which does not affect substantial rights." *Kamer* at ¶ 154. "The state bears the burden of proving that the error did not affect a defendant's substantial rights." *Id.,* citing *Moore* at ¶ 33. "When determining whether a trial court's improper admission of other acts evidence affected the substantial rights of a defendant, an appellate court must (1) determine whether the error prejudiced the defendant (i.e., the error affected the verdict), (2) declare a belief that the error was not harmless beyond a reasonable doubt, and (3) excise the improper evidence from the record, look to the remaining evidence, and determine whether there is evidence beyond a reasonable doubt of defendant's guilt." *Kamer* at ¶ 155, citing *State v. Harris*, 2015-Ohio-166, ¶37. "In other words, 'an appellate court must consider both the impact of the offending evidence on the verdict and the strength of the remaining evidence.'" *Id.*

{¶ 117} At the outset, we recognize that the similar nature of the improperly admitted "other acts" evidence to the charged offense weighs in favor of finding that the error was not harmless. *See Kryling* at ¶ 55, citing *Kamer* at ¶ 156. However, we find, after excising the improperly admitted evidence, that the remaining evidence at trial,

38.

including the testimony of witnesses Brown and Walters regarding the constructive possession of the drugs, overwhelmingly establishes Boyd's guilt beyond a reasonable doubt.

{¶ 118} In this case, the remaining (undisputed) evidence shows that Boyd asked Brown to drive him to West Virginia, and that Boyd agreed to pay her $700 to do it. The evidence further showed that Boyd put the duffel bag full of drugs in the car, and that it was Boyd, and Boyd alone, who had access to the duffel and the drugs from his position in the back seat of Brown's rental car. Finally, there was testimony by both Brown and Walters that prior to the traffic stop and police search, neither Brown nor Walters was aware of the bag's contents.

{¶ 119} In this circumstance, it is appropriate to find that the improper admission of "other acts" evidence was harmless error. *See Kryling* at ¶ 58, citing *Kamer* at ¶ 159, quoting *State v. Rahman*, 23 Ohio St.3d 146, 151 (1986) ("'[C]ases where imposition of harmless error is appropriate must involve … overwhelming evidence of guilt[.]'"). For these reasons, we find that the trial court's error in improperly admitting the "other acts" evidence in violation of Evid.R. 404(B) at trial was harmless and does not warrant reversal of Boyd's conviction. Therefore, we find Boyd's third assignment of error not well-taken.

**The trial court did not abuse its discretion when it gave a standard complicity instruction at trial.**

{¶ 120} Boyd argues in his fourth and final assignment of error that the trial court erred in giving a complicity instruction, first because there was "not any evidence

39.

presented by the state that either the front seat passenger or the driver were involved in the criminal acts." He then argues, seemingly paradoxically, that the complicity instruction unfairly and prejudicially undermined his defense that he was an innocent passenger, who was merely present and not culpable.

{¶ 121} "'The court must give all instructions that are relevant and necessary for the jury to weigh the evidence and discharge its duty as the factfinder.'" *State v. Carter,* 2024-Ohio-444, ¶ 14 (10th Dist.), citing *State v. Joy*, 74 Ohio St.3d 178, 181 (1995). (Additional citation omitted.) On the other hand, "'It is well established that the trial court will not instruct the jury where there is no evidence to support an issue.'" *State v. Mankin*, 2020-Ohio-5317, ¶ 34 (10th Dist.), quoting *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591 (1991). (Additional citation omitted.) When reviewing a record to determine whether there is sufficient evidence to support the provision of an instruction, "'an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction.'" *Murphy* at 591, quoting *Feterle v. Huettner,* 28 Ohio St.2d 54, (1971) syllabus.

{¶ 122} In general, a trial court's jury instructions are reviewed for an abuse of discretion. *State v. Dovangpraseuth*, 2006-Ohio-1533, ¶ 30 (10th Dist.). "An appellate court will not reverse a conviction in a criminal case due to jury instructions unless the jury instructions amount to prejudicial error." *State v. Munye*, 2015-Ohio-3362, ¶ 15 (10th Dist.), citing *State v. Moody*, 2001 WL 242547 (Mar. 13, 2001), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph two of the syllabus. "Prejudicial error is

40.

found where a court fails to give an instruction that is pertinent to the case, states the law correctly, and is not covered by the general charge. *Carter* at ¶ 15, citing *State v. Sneed*, 63 Ohio St.3d 3, 9 (1992); *State v. Angel*, 2021-Ohio-4322, ¶ 67 (10th Dist.), quoting *Joy* at 181. "No purpose is served by giving instructions on law that does not apply to the facts and circumstances of the case." *State v. O.E.P.T.*, 2023-Ohio-2035, ¶ 83 (10th Dist.). "'In general, the rule regarding appellate review of jury instructions is that a sole instruction must be viewed within the context of the whole set rather than in isolation.'" *State v. Moore*, 2007-Ohio-5905, ¶ 26 (3d Dist.).

{¶ 123} "It is well established that the prosecution '"may charge and try an aider and abettor as a principal[,] and if the evidence at trial reasonably indicates that the defendant was an aider or abettor rather than a principal offender, a jury instruction regarding complicity may be given."'" *State v. Lane*, 2022-Ohio-3775, ¶ 64 (3d Dist.), citing *State v. Sidders*, 2009-Ohio-409, ¶ 37 (3d Dist.), quoting *State v. Demecs*, 2006-Ohio-3802, ¶ 18 (6th Dist.).

{¶ 124} R.C. 2923.03 defines complicity and provides, in pertinent part:

> (A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
>
> …
>
> (2) Aid or abet another in committing the offense[.]
>
> …
>
> (D) If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the

41.

> court, when it charges the jury, shall state substantially the following:
>
> "The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.
>
> It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth."

"'The legislative purpose of R.C. 2923.03(D) is to alert juries of the potentially self-serving motivation behind an accomplice's testimony in a strong and uniform manner.'" *State v. Williams*, 2019-Ohio-2657, ¶ 50 (6th Dist.), quoting *State v. Woodson*, 2004-Ohio-5713, ¶ 17 (10th Dist.), citing *State v. Ramsey*, 2004-Ohio-3618, ¶ 49 (8th Dist.).

{¶ 125} In this case, the evidence permitted the jury to come to one of four conclusions: 1) Boyd acted alone in committing the offenses; 2) Brown and/or Walters aided or abetted Boyd in committing the offenses; 3) Boyd aided or abetted Brown and/or Walters in committing the offenses; or 4) Boyd was not guilty of the offenses. Although Brown and Walters were not charged, claimed to have had no knowledge of the drugs, and said the duffel bag belonged to Boyd, many of the criminal factors cited by Trooper Baker involved those witnesses, and not Boyd. And as noted by the trial court, Brown and Walters, who traveled with Boyd in the rental car that carried the bag of drugs and had "some knowledge of events that occurred," may well have been voluntarily involved in illegal conduct or, conversely, may have been completely innocent.

42.

**{¶ 126}** Boyd, on his side, claimed to have had no knowledge of the duffel bag and the drugs; therefore, at trial -- from opening statements, through cross-examination of the State's witnesses, to closing statements -- he pointed the finger of blame at Brown and Walters. Whether or not Brown and Walters were involved in the criminal activity and whether their testimony was credible was for the jury to decide, and the trial court's instructions contemplated and provided for all potential allowable outcomes.

**{¶ 127}** Boyd claims that the complicity instruction prejudicially undermined any conclusion that he was simply an innocent party. To the contrary, the trial court made clear in its instructions that "the mere presence of a person at the scene of an offense is not sufficient to prove, in and of itself, that they were an aider and abettor. There must be some substantial and overt act committed to make someone an aider and abettor, or that shows beyond a reasonable doubt their knowing complicity in committing a crime."

**{¶ 128}** The complicity theory and instruction actually helped Boyd, inasmuch as it gave rise to the accomplice instruction, which advised the jury that if it concluded that either or both witnesses were more than merely present and were, instead accomplices, their testimony, although admissible, should be viewed with grave suspicion and weighed with great caution. Viewing the complicity instruction in light of the evidence and within the context of the whole set of jury instructions, we find no abuse of discretion and no error, much less prejudicial error, on the part of the trial court. Accordingly, Boyd's fourth assignment of error is found not well-taken.

43.

**Conclusion**

**{¶ 129}** The judgment of the Ottawa County Court of Common Pleas is affirmed.

Appellant is ordered to pay the costs of appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.           _____

                                                 JUDGE

Myron C. Duhart, J.         

                                   _____

Charles E. Sulek, P.J.                                JUDGE
CONCUR.

                                   _____

                                                   JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.